### RICHARD D. SHAW v. JOHN BROWN.

1. MASTER AND SLAVE: RIGHT TO CARRY SLAVE OUT OF THE STATE, AND EMAN-CIPATE HIM.—The owner of a slave, domiciled in this State, may lawfully remove him to another State where emancipation is allowed, and there manumit him, in accordance with the laws of that State.    This power results from the absolute dominion of the owner over his property, and is not prohibited by the laws, or contrary to the policy of this State, but is expressly recognized by the Act of 1842.    Hutch. Dig. 537, § 2.

2. SAME: EMANCIPATION OUT OF THE STATE, IN FRAUD OF ITS LAWS, VOID.—If a slave be carried by his owner from this State to another, with the intent of manumitting him, and bringing back to this State, and he be so manumitted and brought back, the act of emancipation being an evasion, and in fraud of the laws of this State, will be void.

3. SAME: SAME: EFFECT OF UNLAWFUL INTENT TO BRING FREED-MAN BACK, NOT EXECUTED.—An unlawful intent, not carried out, cannot have the effect of invalidating an act otherwise good and valid; and hence, if the owner of a slave, domiciled in this State, carry him to another State, with the intent to emancipate him there, and then to bring him back to this State, to reside here as a free person; and, in pursuance thereof, does actually emancipate him, but the slave thus emancipated never returns, the act of emancipation will be held valid by the courts of this State.

4. SAME: SAME: RULE, WHEN INTENT TO BRING THE MANUMITTED SLAVE BACK, IS ABANDONED.—The return, or removal back to this State, of a manumitted slave, who had been taken to another State by his master for emancipation, with the intent to bring him back to enjoy his freedom here, must be in imme-

diate connection with, and a part of, the transaction of emancipation, in order to invalidate it; and hence, if the intent to return be abandoned after manumission, and the freed-man becomes permanently domiciled in, and a resident of, another State, in pursuance of its laws, his subsequent return to this State, for a temporary purpose, will not render him a slave here.

5. SAME: NOT NECESSARY TO PROVE LEGALITY OF MANUMITTED SLAVE'S RESIDENCE IN ANOTHER STATE, UNLESS IT BE ATTACKED IN THE BILL.—If a bill in equity attack the validity of an act of emancipation, upon the ground, that the slave was carried by his owner from this State to another, with the intent there to manumit him, and remove him back to this State, in fraud of the laws prohibiting emancipation; but do not call in question the legality of his residence in such foreign State; proof, that the manumitted slave resided in a free State for six years, and, during all that time, acted as a free person, and was so regarded by the community in which he lived, is sufficient to raise the presumption, that his residence there was legally acquired.

6. INTERNATIONAL LAW: COMITY AMONG STATES OF THE UNION.—It is not true, that the States of this confederacy extend to each other no other rights than those which are given by the Constitution of the United States; but, on the contrary, the principles of private international law and the comity of nations apply with greater force, as between the inhabitants and citizens of the several States, than between foreign nations.   See *Bank of Augusta* v. *Earle,* 13 Pet. 519, 590.

7. SAME: COMITY AMONG THE STATES AS TO FREE NEGROES: THEIR STATUS.— Free persons of African descent are not citizens of the States in which they reside, within the meaning of the Constitution of the United States; yet, though they are an inferior and subordinate class, having no rights, except such as those who hold the power and government, may choose to grant them, they are, nevertheless, subjects and inhabitants of, and derive their rights of person and property from, the States of their residence; and, by the comity of nations, they are entitled to the enjoyment of such rights in every other State in the Union, unless the exercise thereof be positively prohibited by, or incompatible with, the laws and policy of the State in which they are claimed.

8. SAME: POLICY OF THIS STATE IN REFERENCE TO FREE NEGROES: WHAT RIGHTS RECOGNIZED.—Free negroes of other States are not regarded as *outlaws, banished persons,* or *alien enemies,* in this State, and, as such, entirely without the protection of our laws; but such persons, being inhabitants of the co-States, are entitled, upon reasons of comity, to enjoy here all the rights secured to them in the place of their domicil, which are not positively prohibited by law, or contrary to public policy.

9. SAME: SAME: FREE NEGRO MAY TAKE PECUNIARY LEGACY IN THIS STATE.— The ingress and residence in this State, of free negroes of other States, is prohibited; but the reason of this policy has reference to the prevention of their presence here, and the consequent danger from their improper interference with our slaves, and the force of their example, in producing discontent and insubordination among them; and hence, they are only debarred from

exercising such rights here as require their personal presence. A free negro of another State may, therefore, lawfully be the legatee of a pecuniary bequest, which is directed by the will to be raised by the sale of the testator's plantation and slaves, and paid to the legatee by the executor out of this State.

APPEAL from the Chancery Court of Amite county. Hon. Stanhope Posey, chancellor.

This was a bill filed by John Brown against Richard D. Shaw, executor of the last will and testament of James Brown, deceased. The complainant alleged that he was a brother of the said James Brown, who died without any lawful issue, and one of his heirs-at-law; that James Brown, the testator, had been personally domiciled in Amite county, in this State, for more than twenty years preceding his death, which took place in January, A.D. 1856, and was possessed, during that period, and at the time of his death, of a plantation and slaves in that county; that he possessed, among other slaves, a mulatto woman, named Harriet, who had issue two children, named Francis and Jerome, whom the testator claimed to be his sons; that, in 1849, said James Brown, with intent to evade the laws of this State, in relation to the emancipation of slaves, carried said Francis and Jerome with him to Cincinnati, in the State of Ohio, and there, " with the intent to emancipate them, in fraud of the laws of this State," and afterwards " to return with them, to reside in this State," he executed a deed of emancipation in favor of said Francis and Jerome; and did, thereupon, immediately return from Ohio, with said Francis and Jerome, to this State to reside ; that said Francis and Jerome, notwithstanding the premises, are still slaves, and the property of the estate of said James Brown.

The bill further charges, that said Brown, in January, A.D. 1856, still being a citizen of this State, died, leaving a paper, purporting to be his last will and testament, dated the 9th day of October, A.D. 1853; that, by this instrument, Richard D. Shaw and Lemuel R. Hanks were nominated executors,—and that they have propounded the same for probate in the Court of Probates of Amite county, in this State,—and that the same was probated in April, A.D. 1856.

This instrument is made an exhibit to the bill, and, in substance,

provides, that the said executors shall sell the land and slaves of the deceased, as soon as convenient; and, after paying the debts of the testator, that they shall deposit the surplus in the Bank of Louisiana, subject to the order of Francis M. Brown; and, in case of his death, subject to the order of Jerome B. Brown.

The bill further alleges, that no bond has been required of the executors,—and that they are about to execute the trusts of the said supposed will; that said Francis M. and Jerome B. are still slaves; and said bequests are "void, against public policy, in fraud of the laws of this State, and pernicious and detestable as an example," and ought not to be executed; that complainant, with the other brothers and sisters of the said James Brown, are entitled to the property mentioned in the said instrument, as in case of intestacy.

The prayer is for an injunction against the executors, restraining them from executing said will, and for a decree declaring said bequests void.

Lemuel R. Hanks, having renounced his office as executor, Richard D. Shaw, the other executor, answered the bill in substance, as follows: He admitted that up to the 11th of May, A.D. 1850, the testator owned a female slave, named Harriet, and that said Harriet had, prior to that time, given birth to two male children, viz., Francis and Jerome, whom the testator, for a long time preceding his death, claimed and acknowledged as his children. The answer admits the execution and probate of the will, as stated in the bill; and that it is the intention of the respondent to execute the trusts thereof, unless restrained by an order of the court.

The answer denies, that in 1849, the testator carried said Francis and Jerome to the State of Ohio, with the intention alleged in the bill; but states that in 1849 said testator started to the State of Ohio with said persons, intending there to emancipate them; but that, owing to the low stage of the river, he could not reach his intended destination; and that he then returned to this State, with the said Francis and Jerome; that in the spring of 1850, said testator did carry said Francis and Jerome to Cincinnati, in the State of Ohio, for the purpose of setting them free, and that on the 11th of May, 1850, he executed and delivered to them, in the State of

Ohio, deeds of emancipation; and that, without returning with them to this State, he did, on or about the 1st of June of that year, settle them in the State of Indiana, where they have ever since resided.

The answer further states, that it was not the intention of said Brown, that said Francis and Jerome should return to this State to reside, in fraud of the laws thereof, as alleged; that from said 11th day of May, 1850, up to the present time, neither the said Francis, nor the said Jerome, has resided in this State; but, that each of them has, during all that time, resided either in Ohio or Indiana, with the consent of said Brown. The answer denies that Francis and Jerome are slaves, and that it was the intention of said James Brown that they should return to this State to reside. It is also stated that Brown, while on a visit to said Francis and Jerome, and their mother Harriet, whom he regarded as free persons, departed this life, in the State of Indiana, leaving said instrument as his will; and that he died unmarried and without legitimate descendants.

The testimony for the complainant is as follows :—

1. E. A. Haygood.—Is a son of a deceased sister of James Brown. On the day preceding the filing of the bill, he sold his interest in the estate to one McCoy, for $1500. Witness states that he knew James Brown for thirty-five years preceding his death, and had known Francis and Jerome since their infancy; to a certain extent Brown treated them as slaves; he controlled, and paid taxes on, them. In April, 1850, Brown left this State with them, for the purpose of carrying them to Ohio and emancipating them. Brown told witness that this was his object, and wrote to witness from Cincinnati that he had accomplished his designs. Francis and Jerome returned to the residence of James Brown, in Amite county, in this State, in the fall of 1850, and went back to Indiana in the spring of 1851; the permanent domicil of Francis and Jerome, from the first of the year 1850, until the last time Francis was here, viz., in the spring of 1854, was at James Brown's residence, in Amite county. Their absence from that place was temporary. He learned, from said Brown and Francis, that the principal object of their absence was to acquire an education; between April, 1850 and 1854, Francis was in Amite county four or five times, and Jerome three

times. Francis was here twice in one year. In conversations witness had with Brown, the latter spoke of Amite county as their home, up to the spring of 1854. Brown emancipated other slaves, viz., Tom, Malinda, and Sarah; the two last are now on Brown's plantation, as slaves, and Tom has gone to parts unknown. Brown said he had torn up the free papers of Sarah. The woman Harriet had four children, which Brown acknowledged to be his, viz., Francis, Jerome, Louisa, and Teresa. After Brown returned from Ohio, in 1850, to wit, on the 14th of May, 1852, he had a will written in favor of Harriet and her four children. Brown spoke of Amite county, about that time, as the residence of Francis and Jerome. Brown showed to witness the emancipation papers of Francis and Jerome. On the return of Francis and Jerome from Ohio, Brown exercised control over them as before, and considered them as slaves, with the exception that they lived in the same house with him, and eat at his table, in company with witness, and the neighbors, who chanced to be there. He said he had emancipated them, and it was so understood in the neighborhood. He paid taxes on them in 1851. Witness does not remember to have heard Brown say that he had settled Harriet and her family in Indiana, and that he intended they should reside there. In 1855 he heard Brown say, that in spite of his good friends, he would overcome the laws of Mississippi, arrange his business his own way, and settle his family to his satisfaction. This was said when Brown was about to start to Indiana, where Harriet and family were. Brown never returned from that trip. Francis was born in 1833, and Jerome is about thirteen years of age. Witness knew George Gillett to have been in Brown's employment. Gillett was part of the time on Brown's plantation, in Amite county, and part of the time travelling with Francis and Jerome, to and from Indiana. Brown said he had employed Gillett to take Francis, Jerome, and their mother to Indiana, in the event of his death.

2. William R. Brown (a son of complainant), stated that he resides in Louisiana, and had known James Brown for a good many years, and had lived with him on his plantation up to 1846, or 1847. Witness knew Harriet and her children, and saw them the last time, at James Brown's house, between the 4th and 10th of July, 1854. At this last mentioned time and place, witness had a

conversation with Brown, in which he spoke of Harriet and her family, and said he had tried to do something for them, by taking them to Louisiana, but finding that place to fail, he had taken them to Ohio, and had there succeeded in emancipating them. He said also that he would show me the papers, and commenced reading them, but was interrupted by the announcement of supper. Brown further stated that he intended to go to Alabama Island, in Louisiana, and look at the country, and "then go and take Harriet and her children to Indiana and sell some property he had there, and if he should find the country at Alabama Island to suit him, he intended to bring Harriet and her children back with him to Alabama Island, and for all of them to reside there." He further stated, that he had made some improvements on his property in Indiana which would enable him to sell it for $50 per acre; he also said that he had brought all their household furniture back to his place in Amite county; that he disliked Indiana, and that he considered the residence of all of them to be in Mississippi; that he had thought that he could emancipate said children through the agency of the Police Jury of Louisiana, but finding that the law in that respect had been changed, he had carried them to Ohio, "to evade the laws of Mississippi." Brown had Harriet and her family assessed as slaves in 1846, and paid taxes on them.

3. John Shelton stated, that he had known Brown seven or eight years prior to his death. In 1850 and 1851, witness resided eight or nine miles from Brown, and subsequently, from thirteen to fifteen miles from him, but witness had frequent interviews with him. The residence of James Brown, and Francis and Jerome, was in Amite county. Brown intended his house to be their residence. *Question.*—How do you know his intention in regard to their residence? *Answer.*—"His intention was to free them, and get me (witness) to take charge of his property for their benefit, which I refused to do. He stated that he did go to Indiana for the purpose of emancipating them, and also purchased a piece of land for them in Indiana, and after his return, again requested me to take charge of his property, for the benefit of said Francis and Jerome, which I again refused to do; he also stated that he called on James M. Smiley and Hamilton M. Knight, to see if he could get tnem emancipated in this State, and being informed by them that he could not ac-

cording to the laws of this State, he then took them to Indiana to have them emancipated and evade the laws of this State, and purchased a piece of land for them, which was to be their future home. He returned to Mississippi, and afterwards they were with him in Mississippi; and he intended this to be their home until his death, as he did not enjoy his health in Indiana, and wished them to be with him." Witness had several conversations with Brown on this subject. The conversations in which he referred to Mississippi as the permanent home of Francis and Jerome, took place in 1850, after Brown's return from Ohio, and in the fall of 1852. Francis and Jerome in the latter part of 1850 were at Brown's in Amite county, so also in the fall of 1852. In 1853, they resided at the same place. Witness does not know where they resided in 1854; thinks they were absent from Brown's in the year 1853. *Question.*— " Do you know, from conversations with James Brown, or otherwise, of his intention to send them out of the State occasionally? If yea, state the conversation." *Answer.*—" I know, from what I could gather from his conversations, that it was his intention for them to go backwards and forwards to Indiana, to evade the laws of this State; he stated that he had a temporary residence for them in Indiana."

Cross-examined.—In the fall of 1852, Brown regarded the residence of Francis and Jerome as in Amite county; from 1850, to 1853, Jerome spent most of his time at Brown's residence, in Amite county, but he could not say how much time Francis spent there. Brown stated that his house was their residence; that it was not healthy enough for them in Indiana, and that their residence there was temporary; Brown told witness he had emancipated them and purchased a place for himself (not for them), in Indiana, and carried them there, and remained with them the greater portion of 1853, and that Indiana was a free State. Brown requested witness to purchase a place for them in Louisiana, that he could not free them in Mississippi, " and that he was going to try to do so in Louisiana;" no purchase, however was made. He stated his object, in wishing to settle them in Louisiana, was " to see if the laws of that State would not free them." Witness saw Francis and Jerome and Brown last, in 1853.

Testimony for defendant:—

Philip R. James.—Witness knew Brown well, and also woman Harriet, and her family. In 1849, Brown urged witness to go with him to Texas, to obtain land for his family; witness advised against this course, and recommended Brown to remove them to a free State, to which Brown assented. In 1853, Brown stated to witness that he had purchased a place for Harriet and family in Indiana, and had tried to do all he could for them there, and wished them to remain there until he could sell his property in Mississippi, and then he would go there himself; that some of them (mentioning Harriet and Francis), had returned to Mississippi, contrary to his wishes. He further stated that Francis was in Indiana, and that he was married and doing well; that his object in sending them out of the State was to prevent his relatives from forcing them into slavery. He referred to the Lewis Weathersby case, which originated in Amite county. (See 13 S. & M. 685.)

George Hoadley stated, that he resides in Cincinnati, and is the notary public before whom the deeds of emancipation of 11th of May, 1850, were executed; that Brown executed and delivered deeds to each of them, said Harriet and her children. The witness sets out these deeds, and they purport to set free the said Harriet and her children. Witness further stated that Brown conversed with him freely about his intentions respecting Harriet and her four children, and told witness that he would not take them back to Mississippi; that it was unsafe to do so, and that he intended to settle them either in Ohio or Indiana for education and residence, and that he would himself return to Mississippi.

George H. Gillett stated, that he became acquainted with James Brown in Jefferson county, Indiana, in June, 1850. Brown had with him, at that time, Harriet and her four children, and a negro man named Tom. He claimed that he was the father of Harriet's children. Tom had free papers. Brown said his object was to educate his children and settle them in that county; they were recognized there as free persons, and he supposed Brown so recognized them; he sent the children to school there. Brown remained there from June to September of 1850, and then left for Mississippi, taking with him the man Tom. Francis and Jerome went to school in Indiana from 1850 to September, 1852. Francis remained there until December, 1852. Jerome went to Mississippi in 1852. They

both returned to Indiana in May or June, 1853. Francis then remained there until January, 1854, and Jerome remained (in Jefferson county) until the fall of 1854, when he went to Green county, Indiana, where he has remained ever since. In April, 1854, Francis returned to Jefferson county, and remained there until October, 1854, when he removed to Green county, Indiana, where he has been ever since. When Francis and Jerome left Indiana, in 1852, Francis went to Mississippi on a visit. Jerome was a small boy, and witness does not know what he went for. Witness does not know whether Francis's trip, in 1854, to Mississippi, was on a visit, or for residence. Brown had told Francis, that if he would come back, he would buy him a place in Louisiana, and remove his (Brown's) slaves to it, and that Francis could hire them. No place could be found to suit Francis, and he returned to Indiana, where he has resided from that time to the present. Brown went to Green county, Indiana, in May 1855, and remained there until he died, in January, 1856; during this time he lived with his family there, including Francis and Jerome. In November, 1855, Brown gave witness money to purchase a piece of land for Francis. Witness bought the land, taking titles in Francis's name, and Francis has resided on it ever since. Brown told witness, frequently, that he had emancipated Francis and Jerome, and that he had a will giving them his property.

Witness lived with Brown and transacted business for him since October, 1852. Brown told witness his object in bringing his family to Indiana, was to educate them and enable them to hold property; that this could not be accomplished in Mississippi, and for that reason he wanted to settle them elsewhere, and that this was his reason for taking them from Mississippi. Witness has heard Brown frequently speak of bringing his family back to Mississippi. Brown exercised the same control over Jerome and Francis, that a father exercises over his children; they acted generally as he desired they should. Witness thinks they would not have gone back to Mississippi when they did, unless by Brown's consent.

Brown claimed to be a citizen of Mississippi.

Joseph R. Richardson stated that he was overseer for Brown, and lived on his plantation continuously during the years 1849, '50, and '51; was never absent from the place more than a week at one

time; that Brown left Mississippi in 1850, taking with him Tom and Harriet and her four children, stating that his object was to go to Indiana to educate the children. He returned in September, 1850, bringing with him the man Tom. Neither Harriet nor any of her children returned at that time, and that neither Francis or Jerome returned up to 1852. Francis returned to this State in 1853, and went off in January, 1854. Brown never told witness about the time he left in 1850, that he intended to emancipate Harriet and her children. He said then, that he would bring the children back when they were done going to school. Brown claimed that his residence in Amite county was the home of Francis and Jerome, up to 1854; "this residence continued from 1849." After the return of Francis to Mississippi, in 1853, Brown told him that Francis had returned to look out for a place in Louisiana suitable for a saw-mill, and then he would send Gillett and Francis there to attend to it. Witness said that the control exercised by Brown over Francis was that of a father, but he exercised the same sort of control over other negroes on the place. He never heard Brown acknowledge that Harriet's children were his offspring.

James Smith stated, that he resided on the plantation of James Brown, in Amite county, during the year 1852. He knew Jerome and Francis: the former came to Mississippi from Indiana about the 17th of September, 1852, but Francis was on the place that year; he did not arrive until January, 1853: he came with a lot of flour, which he claimed as his own and sold there as his own. During the time Jerome and Francis were at Brown's house, Brown did not treat them as slaves; they ate at his table, slept in his house, &c. Francis went, when and where, he pleased, hunted, fished, exercised authority on the place, as any young man would on his father's plantation, ordered the negroes to do what he considered necessary.

Witness saw Brown on the eve of his departure for Indiana in 1855. He asked witness to find him a purchaser for his place, and said he wanted to sell everything he had, and spend the balance of his days in the " upper country."

E. A. B. Hanks stated, that he went to live with Brown about 21st January, 1854, and remained on his place until 27th December, 1855. He knew Francis, but never saw Jerome. They were com-

monly known as Francis and Jerome Brown. Saw Francis at Brown's about 1st June, 1854; Francis then left to go to Indiana. He had been at Brown's since about 1st January, 1854, when he arrived there from Indiana. Brown recognized him as a free person, judging from the liberties he allowed him; he did as he pleased, went where he pleased, and called Brown "father." Brown recognized Indiana as the home of Francis. When Francis left in 1854, he said that he was leaving the State of Mississippi for the purpose of removing, and that he did not intend to come again. Brown made no objection to his going. He left in company with George Gillett, and Brown told witness after they left that Gillett had bought a place in Indiana, for Harriet and her children, with $2500, which he had given him for that purpose.

H. N. Shaw stated, that he has lived at James Brown's plantation since January, 1856. Francis has not been there during that time. When Francis left, in 1854, he told witness he did not intend to return any more. After the death of Brown, Shaw, the executor, wrote to Francis, advising him not to come to Mississippi.

The depositions of Lucy Wilson, James Nelson, Mary Ann Record, Silas Record, Jacob Terris, William Brazleton, Lucy Hoyt, Martha Craven, and William, residents of Jefferson county, Indiana, were also read in behalf of defendant. All these witnesses resided in Jefferson county, in June, 1850, when Brown arrived there with Harriet and her family; they then became acquainted with Brown, and Francis and Jerome; they all concurred in the statement that Brown came there and declared that Francis and Jerome were free persons, and that he had emancipated them in Cincinnati, for the purpose of educating them and settling them in Indiana; that he spoke of them as his children, and declared that he intended to settle them in Indiana, as their permanent home; that Jerome went to school most of the time, and Francis a part of the time, and a part of the time he worked as a carpenter; that they both resided continuously in Jefferson county from their first arrival there, in June, 1850, till the fall of 1854, except one visit by Jerome to Mississippi, and two by Francis; that Jerome's only visit to this State was in the fall of 1852, and from that visit he returned in the spring of 1853; that Francis first went to Mississippi in December, 1852, carrying some flour, and that he returned in the

spring of 1853; that again, in the winter of '53 and '54, he visited Mississippi, and returned in the summer of '54; that they lived in the same neighborhood with Francis and Jerome, and knew of no other absences than as above, and that they regarded these absences as visits merely; that Francis and Jerome were recognized by the community as free persons, and that Francis traded on his own account.

Leonard Terris and M. H. Shryer, who reside in Green county, Indiana, stated in substance, that Francis and Jerome came to that county to reside in 1854 or 1855, and that they, from that time, continued to reside there till their depositions were taken, in 1857; that they are recognized as free persons; that Francis owns a farm there. Brown came there in 1855, and lived with Harriet till he died, in January, 1856. He often spoke to the witnesses freely of his plans and intentions in respect to Harriet and her children; of his having emancipated them in Cincinnati, and having first settled them in Jefferson county; he also spoke of meeting George Gillett, who advised him to purchase lands in Green county, which he did. He openly lived with his family in Green county, and stated that he intended to remove there. That neither Francis nor Jerome has left Green county since they came there.

The will, spoken of by witness, Haygood, as having been made by Brown on the 14th of May, 1852, was also offered in evidence by defendant. This will disposes of all his property to Harriet and her four children, whom he describes as "free persons of color, all of whom now reside in the county of Jefferson, State of Indiana."

Upon final hearing, the chancellor granted a perpetual injunction against the payment of the legacies bequeathed in the will to Francis and Jerome Brown, from which decree the defendant appealed.

*W. P. Harris,* for appellant,

After stating the substance of the case, argued:

At this point it should be noted,

1st. It is apparent that Francis and Jerome, in coming back to Mississippi, after their first departure, in 1850, did not come back to return to a condition of servitude, and that their return was not so regarded by James Brown.

2d. If Brown spoke of Mississippi as the home of Francis and Jerome, to the witnesses, Haygood, Brown, and Shelton, as they state, it is equally certain that he made declarations, to many other persons, more explicit,—contemporaneous with acts confirming the purpose, that Indiana was their permanent home.

3d. These declarations accord with the known result of his proceedings, with his well-established purpose and object, formed on a perfect understanding of the obstacles opposed to their residence in Mississippi.

4th. The witnesses, Haygood and Shelton, in their statements respecting the return of Francis and Jerome to this State, and the time spent here, are contradicted by the nine witnesses in Jefferson county, where Jerome and Francis attended school; by George Gillett, by Richardson and Smith, of this State, who lived upon the plantation of Brown from 1849 down to 1852, and during that year.

5th. The statement of Haygood, that Brown paid taxes on Jerome and Francis, in 1851, is susceptible of an explanation, which deprives it of all importance as a fact in the cause. Brown properly regarded them as taxable property up to the date of their emancipation, which took place, according to his understanding, on the 11th of May, 1850. This made them taxable property for the fiscal year ending on the 30th of April, 1851. Brown, therefore, attaching but little importance to so small a matter, might well have paid taxes between January, 1851, and the 30th of April, 1851,—there being no proof of the payment of taxes on them subsequent to 1851, strengthens this hypothesis.

On this evidence we feel authorized to state the following as well-founded propositions in the cause:—

1st. That in 1850, Brown, with the intention that Francis and Jerome, the legatees under the will, should become and remain free persons, carried them into the State of Indiana, a State, by the laws of which slavery cannot exist, and that said Francis and Jerome are now residing there, and if they returned to Mississippi at any time, it was not to return to a condition of slavery, and such return was temporary, and followed by their going back to Indiana.

2d. That after the said Francis arrived at age, with the consent

of James Brown, he went to Indiana in 1854, and has resided there openly, as a free person, ever since, with the knowledge and approbation of said James Brown, and that he owns real estate there, on which he resides, as a free inhabitant of the State of Indiana, with the apparent approbation of the civil authorities of that State.

3d. That the allegation in the complainant's bill, that James Brown, on his return from his visit to Ohio or Indiana, in 1850, brought back said Francis and Jerome to this State with.him, is not true.

4th. That there is a clear preponderance of proof, according to every fair test of truth, in favor of the statements contained in the answer of Shaw, and the position that said Francis and Jerome did not return to this State prior to September, 1852, and then only on a visit, and not to reside here.

5th. That there is no proof of an intention on the part of Francis and Jerome to obtain their freedom, to be enjoyed here, by a residence here.

The court below, on the case thus presented, declared the bequests of the will void, and decreed a perpetual injunction against Shaw, the executor and trustee. We think this decision wrong, whether it turned on a question of fact, or on a question of law.

The will of James Brown appears to have been executed according to the forms of law, and has been admitted to probate. It is valid as a will, and is efficient to dispose of the property on which it was designed to operate, unless the testamentary purpose was invalid by reason of some prohibition contained in or resulting from the statutes of this State, or unless the legatees were by the same means rendered incapable of taking the bequests intended for them. The Statute of Wills contains no such prohibition, and it may be safely affirmed that there is no limitation upon the testamentary power imposed by any other statute of this State, which is, in letter or spirit, repugnant to the provisions contained in the will now under consideration. The will does not provide for the emancipation of, nor is it in furtherance of any design to emancipate slaves. The testator had otherwise, than by his will, taken all the steps deemed requisite, by him, to effect the emancipation of the legatees, prior to the date of his will, and certainly prior to the time it took effect. It was not designed, nor does in any respect

purport, to aid in the emancipation of any person held "to service for life within this State."

The will, however, bestows property according to the testator's design, upon persons who, in his opinion, at the time, were free colored persons, and not only free colored persons, but the children of the testator, by his female slave. We propose to notice these facts briefly, not because we think them material as the foundation of any argument against the validity of the bequests, but because we are informed that they entered somewhat into the reasons assigned by the judge of the Circuit Court for his decision. We are satisfied that what may be said on this branch of the case, can serve only to answer a popular prejudice against free negroes, which has not the force of a declared public policy, or a moral sentiment, which has not taken the form of law. Free negroes are capable of acquiring and of holding property. The case of *Fanny Leiper* v. *Hoffman*, 26 Miss. Rep. 615, establishes this proposition in a very strong case. Our legislature indicates no policy averse to it. On the contrary, where the legislature has noticed the subject at all, a different policy is indicated. See Act of 1844, for the relief of Bernard Bevoril, and the case reported in S. & M. 32. There is no prohibition contained in the written or unwritten law of this State. The capacity of such persons to hold property, has been distinctly recognized here, and in every other slave State, so far as we know, and there is no reason for discriminating between the various modes of lawful acquisition, whether it be by gift, bequest, or purchase. There can be no sound policy in withholding from free negroes, this great incentive to industry and good conduct. *Legrand* v. *Darnall*, 2 Peters, 666; 10 Grattan, 485.

Was the relation in which the testator stood towards the legatees such, as to affect his power over his property, or their capacity to take, he being their father, and their mother his slave, at the time of their birth? Or did this criminal connection with the mother, affect the testator's right to emancipate them, or their capacity to acquire freedom through the agency of a foreign law, co-operating with the act and consent of the testator, their master? These questions are not to be answered according to our notions of moral expediency, but according to our convictions as lawyers. The eminent and upright judge who pronounced the opinion of the court, in *Hines*

v. *Brazeale,* remarked that the example was "pernicious and detestable ;" but this was not the ground on which he based his decision. The bequest, in that case, was declared void, because it was made to a slave. There had been an attempt to emancipate in that case, but the court held that it failed, by reason of the intention of the slave and the master, that the deed of emancipation should take effect in this State, and that the freedom that it was intended to confer, should be realized and enjoyed in Mississippi, by a residence here. The deed was declared void for this cause only, and the decision would have been the same, although no debasing connection between the master and his slave had been shown.

An illegitimate child is capable of inheriting property in this State, and the children of an incestuous intercourse, however revolting, can inherit from the mother and from each other. 14 Peters, 178. There can be no stronger case found than the one just cited. The case in 2 Peters, 666, and that in 10 Grattan, 485, are cases of wills in favor of persons owing precisely the same relation to the testators, which exists between the legatees here, and James Brown, the testator. The capacity of the issue of an incestuous intercourse to acquire property, has never been questioned anywhere. We repeat that we notice these questions only for the reason before stated. There was no design in the case of *Hines* and *Brazeale,* to shelter the decision under the sentiment of repugnance expressed by Judge Sharkey to the "example," which was then brought to his notice, and there seems to be something of mockery in the attempt of the complainant, to disguise a palpable design to get what was not intended for him, under a professed moral aversion to the debasing nature of the connection from which the legatees sprang. The laws of the land were not invoked to punish the guilty party while he lived, though his crime was notorious. That which was tolerated while he lived, became intolerable when the contents of his will were made known. It is to be regretted, that the attempt to enlist the indignation of the courts of the country, was not made at some other stage of this transaction, for it must be confessed that it seems to be a little too late now. Francis and Jerome are innocent, and we are likely to derive but little benefit from moral precepts, directed from the point where the complainant stands.

The only question in this cause, therefore, is whether the lega-

tees, Francis and Jerome, were free persons when the will of James Brown took effect?

It will appear obvious to any one who has read the case of *Hinds* v. *Brazeale*, 2 Howard Miss. 837, that the complainant framed his bill with direct reference to that case. But the points of difference between that case, and the case developed by the evidence here, are so prominent and important, as to render the former inapplicable to the latter, in almost every material respect, if we except the grave censure which the court directed at the "example," which was then brought to its notice. The case in 2 Howard was briefly this: The owner of two slaves, John Munroe and his mother, carried them to Ohio and there executed to them a deed of emancipation, and immediately returned with them to this State, where they resided up to the time of the death of the owner, and, in fact, up to the date of the decision, so far as appears. The court held them to be slaves, and incapable of taking a bequest made to them by their owner. The language of Judge Sharkey, is, "The acts of the parties in going to Ohio with the slaves, and there executing the deed, and his immediate return with the slaves to this State, point with unerring certainty to his purpose and object." Citing the case of *Lewis* v. *Fullerton*, 1 Randolph, 15, the character of which may be well understood by the following quotation: " As to the deed of emancipation contained in the record, that deed taken in connection with the evidence offered in support of it shows that it had a reference to the State of Virginia, and the testimony shows that it formed a part of this contract, that whereby the slave Milly was to be brought back, as she was brought back, into the State of Virginia. Her object, therefore, was to secure her freedom, by the deed, within the State of Virginia,—and when she should be found abiding within the State of Virginia." The court in the case of *Hinds* v. *Brazeale*, referred to the law of this State prohibiting emancipation in this State, except with the concurrence of legislative authority, and to the law of this State prohibiting the emigration to this State of free negroes, as showing a policy averse to the increase of free negroes within this State, which policy it justly said would be completely subverted by sanctioning the evasion which the acts of the parties demonstrably proved.

In the cases just cited the persons whose status and capacity the

courts of Virginia and Mississippi were called upon to determine, had not attempted nor simulated a change of domicil. They continued, after the deed of emancipation, to reside, and their acts contemplated a continued residence in the States, the courts of which were invoked. They were actual inhabitants of those States, having merely performed a Gretna Green exploit. The court had jurisdiction over the person, and was clearly empowered to pronounce upon their capacity and condition, as affected by the laws of the State in which the parties lived.

In the present case, we are met at the outset with the fact, that Francis and Jerome, when the will of James Brown took effect by his death, were actual inhabitants of the State of Indiana, having lived there openly as such, for a considerable time previous, and with Brown's approbation. In this case there is wanting that demonstrative evidence, furnished by the immediate return to and continuance in this State ; and it must be conceded that constructive domicil only, is all that can be claimed to have followed the act of emancipation depending upon evidence of intention, and that evidence, not in harmony with the general and unmistakable tenor of the undisputed facts of the case, and greatly weakened, if not destroyed, by contradiction. Francis is not only practically and essentially an inhabitant of Indiana, but is there, under circumstances which make it apparent that we cannot compel his return by any power of our own, nor by invoking the laws of the United States, on the subject of fugitive slaves. The decision, therefore, of a court of this State, declaring Francis to be a slave, would be practically false and impotent. The truth of the case is above contradiction, and Francis is beyond our jurisdiction and control.

It will be found, that the leading cases in which the courts have undertaken to pronounce upon the question of condition and capacity of persons situated as these, are cases where the slaves had returned to, and were within the State, whose courts adjudicated the question. Such was the case of *Dred Scott* v. *Emerson*, in the State Court of Missouri, 15 Missouri, 577 ; *Strader* v. *Graham*, 10 How. U. S. 82 ; *Lewis* v. *Fullerton*, 1 Rand. 15.

There is another feature of this case, which distinguishes it from that of *Hinds* v. *Brazeale*. It is not disputed that Francis (we take him to illustrate), in the summer of 1854, being then of the

age, of majority, left Mississippi, declaring his intention not to return; that his object was to go to Indiana, there to reside, with the consent and approbation of James Brown, openly given, both in Mississippi and Indiana; that he did go to Indiana and became a freeholder and householder there, and continues there as a free person up to this time.   According to the current law on this subject, this constituted Francis a free man, and being such at the time of the testator's death, he was capable of taking a bequest.   But it will be urged, doubtless, that his going to Indiana, subsequent to 1851, could not have the effect legally, of constituting him an inhabitant of Indiana, because of a provision of the Constitution of that State, adopted in 1852, absolutely prohibiting negroes and mulattoes from coming into that State to reside.*   We admit that in 1852, such a constitutional provision was adopted by a vote of the people of that State, and that to carry out that provision, laws were passed by the Legislature of that State, punishing such persons as should violate that provision of the Constitution, and all others who should in anywise encourage such prohibited persons to come into that State to reside.   After making this full admission, we present this answer to the objection founded on it: Subsequent to the date of the various acts, declarations, and transactions out of which the questions respecting the intentions of Brown arise, Francis was in Mississippi, to wit, in 1854.   He left here with the consent of Brown, and with the purpose known to Brown, of going back to the State of Indiana, there to reside, and with the positive declaration, sustained by his subsequent conduct, that he did not intend to return again.   That visit ended his connection with Mississippi.   Brown afterwards went to Indiana, recognized him there as free, and did an act which at common law amounted to emancipation, that is to say, he made him a freeholder.   Here then is Brown's consent, not invalidated by any purpose to introduce Francis to reside in Mississippi, as a free person.   The right of the owner being thus voluntarily surrendered in a free State, and not in contravention of any law or policy of this State, the only question remaining, was between Francis and the authorities of Indiana. If that State was willing to receive him, and did receive him, the

---

* Constitution adopted in convention in 1851; submitted for ratification in 1852.

State of Mississippi has nothing to complain of, because it did not infringe our policy ; Francis, therefore, must make out his claim to residence there, not to our satisfaction, but to the satisfaction of the authorities of Indiana.    It seems to us that we do not dignify our policy, nor fortify our institutions, by prying with too much jealousy into the manner in which the difficulty was settled between the mulatto and the State of Indiana.    Francis, as we are forced to believe, was bound to make out his claim to residence in Indiana, prior to November, 1851, or he could not reside there.    He was, as we know, permitted to live there, and that he continues there in a manner so open, that we cannot believe that he is there without the knowledge and acquiescence of the authorities of that State.    It is known to us, and was known there, that he had resided for a time in that State in 1850, and every fair presumption is that that has been adjudged by Indiana to be sufficient.

It is not material that we might come to a different conclusion on the same evidence, and decide that he did not reside there prior to 1851.    Francis had to satisfy Indiana on that point, and not Mississippi.    If he succeeded, it was sufficient for him and for us.    It appears that he has succeeded, and that he was in fact domiciled there prior to the time the will of James Brown took effect.    We might say that our policy demanded that the residence in Indiana, prior to 1851, being, as is contended by the opponents of the will, connected with a purpose in conflict with our laws, should be regarded as ineffectual for the purpose of emancipation then ; but though ineffectual for one object, still it is a fact which we cannot dispute, and one on which Indiana had a right to place her own construction, and to which she may attach any consequence which her laws and policy require.    We have no policy which forbids Francis to acquire a residence in Indiana, and no policy which requires that he shall be forever regarded as a slave.    It is, therefore, perfectly consistent for us to say, that the residence of Francis in Indiana, prior to 1851, if coupled with a purpose to come to Mississippi to reside as a free person, was ineffectual for emancipation then, and yet to admit that Indiana might properly regard it as effectual to the foundation of a right to reside there subsequent to 1851.    The result to which this view of the case leads, not being one to which our policy is opposed, to wit, the residence of a

free negro in the State of Indiana, to sanction his acquired domicil and capacity in Indiana, in no wise conflicts with that policy. Francis, in order to acquire the domicil which he now openly enjoys, had to rely, as we must presume, upon his claim to previous residence there. If he established his claim, and for aught that appears, he has, there was nothing wanting to give him a perfect right to freedom, but the consent of his owner, disconnected from a purpose to reside in Mississippi. This consent was given in an unequivocal manner. It seems to us that this conclusion must terminate this controversy, without reference to the question which arises, in regard to the original design of James Brown, for the case is reduced to that of Fanny Leiper. The laws of Ohio required certain acts to be done, in order to enable a free negro to reside in that State, but this court, looking to the fact that Fanny Leiper did reside there, presumed that she was there on the terms on which that State permitted such persons to remain there.

We think the evidence in the record shows, that Francis and Jerome were residents of the State of Indiana in 1850, and that they continued to reside there at the time the will took effect, and if any doubt could arise on that point, the fact that they are permitted to remain there now, is sufficient to remove it, for the authorities of Indiana had the means of judging, and we cannot suppose that they have overlooked a violation of their laws. If they have decided that these persons resided there prior to 1851, it is a circumstance showing that they did reside there as inhabitants of that State. It appears that they lived there openly and publicly, and that they were regarded as residents of that State prior to 1851, by the community in which they lived.*

* The party's acts, are more significant and demonstrative of the fact of citizenship or residence, than his declaration. See, on this point, *Shelton* v. *Tiffin*, 6 How. Sup. Ct. Rep. 163. Francis, as the proof shows, beyond a doubt, exercised all the privileges in Indiana which persons of his class could exercise there. He could not exercise political rights there. He could not vote or hold office. But it appears that he did almost every other act which could be looked for in a person of his class, as denoting a residence there as an inhabitant of that State. He cultivated the soil, and used the product in commerce. (It appears that the flour, sold by Francis, was from wheat raised by him.) . He exercised the trade of a carpenter there. He married there, and became the owner of a house and lands there, on which, and in which he resided, as the head of a family,

The constitution applied to those who should come to reside after its passage. The provision must have been well known, for it had been but recently adopted, after it had been widely canvassed among the citizens. The coming of negroes and mulattoes into the State was a circumstance likely to be observed, and calculated to provoke inquiry. The family of Brown was distinctly marked as mulattoes, for we learn that their color caused his rejection at a hotel in Cincinnati. We can indulge no presumption that the authorities of Indiana, permitted an open violation of their constitution. The laws of that State required them to prevent negroes or mulattoes from coming there to reside subsequent to November, 1851, but permitted those who had established a residence there prior to that time, to remain. We must therefore conclude that the public authorities of Indiana, mindful of their duty in this respect, investigated and decided the question of residence; and how? They have decided that Francis and Jerome were residents there prior to 1851. Every fair legal presumption leads to this conclusion. Every fair hypothesis asserts this to be true. Let us now for a moment reflect that the ground of complaint is, that a residence in Mississippi was contemplated by Francis and Jerome. The fact is that it was not contemplated, and that he does not reside here. Our atmosphere is surely not contaminated by their presence in it. With what motive, and to what end, and with what show of law or reason, do we inquire whether the State of Indiana has judged rightly of a matter which affects her alone? If she took the evidence of her own citizens, for whose benefit her constitution was adopted, and compared it with the circumstances in the case, there was ample ground for

at the time the will took effect. The only evidence furnished by him, which in the least degree affects the force of these facts, are two visits to Mississippi, both of which were followed by a return to Indiana, and the last by a declaration that he would not again return to this State. In the case above cited, this court say: "Where an individual has resided in a State for a considerable time, being engaged in the prosecution of business, he may well be presumed to be a citizen of such State, unless the contrary appears; and this presumption is strengthened where the individual lives upon a plantation and cultivates it with a large force, claiming and improving the property as his own. A change of domicil depends on intention, but this intention is more satisfactorily shown by acts than declarations." (1 Curtis's Commentaries, p. 88.)

the conclusion that Francis was rightly domiciled there prior to 1851. It is sufficient for us that his owner, as late as 1854, regarding him as free, permitted him to go to Indiana, a free State, the authorities of which, determining the matter for themselves, allowed him to take up his residence there, and to remain there. This act of Francis violates no law or policy of this State, as has been expressly adjudicated by this court in the case of *Fanny Leiper* v. *Hoffman*, 26 Miss. Rep. 615. In that case, Fanny Leiper not having been manumitted according to our laws, but being by her master allowed the privileges of a free person, remained in this State until after the passage of the Act of 1842 on the subject of emancipation, to wit, until the year 1845, and then, with the consent of her master, went to Ohio, where she resided at the date of the proceeding in which the question of her capacity and condition arose. The court say: "If she had gone to Ohio merely for the purpose of establishing her freedom, with the intention of returning here to exercise it, and had returned here to act as a free person, there would have been force in the objection." "In this material respect the case differs from that of *Hinds* v. *Brazeale*," &c. &c. It is manifest that Francis left this State with the avowed intention not to return, and that he has not returned, and that he now lives in a State the laws of which do not tolerate slavery, and with the consent of the owner.

We are therefore driven to the concession that the act of Francis offended no law of this State, and that he is not here exercising his right to freedom. Shall we then prosecute an inquiry into the question, whether the domicil which he has obtained in Indiana, is a domicil *de facto* or *de jure*. Are we not bound to presume that he lives in Indiana, under such an interpretation of the municipal laws of that State, by her own authorities, as renders his domicil there legal? Const. Indiana, Laws of 1852, 1st vol. 67, 375.

We are relieved, however, in the view we take of this case, of the embarrassment, which the inquiry of which we have been speaking, must occasion. The reare certain admitted facts in the case, from which, according to well-established doctrines, consequences followed, which of necessity determined the condition of Francis and Jerome. It is a fact in the case, that James Brown took these persons to the State of Indiana in 1850, a State whose Constitution

prohibits slavery within its limits, and he placed these persons there of his own accord, for the purpose of educating them. He sent them to school there. He put them on the footing of free persons, and they enjoyed the benefit of the laws and institutions of that State. It was no accidental sojourn there, no temporary visit, no mere presence there *in itinere.* The constitutional provision of that State had certainly the force of a positive statute. Its effect, according to the courts of that State, was such as to dissolve the relation of master and slave. See *State* v. *Lacelle,* 1 Bockford, 60 ; Constitution of 1816, Rev. Stat. Ind. 1843, p. 57–60.

We may, with much justice, question the soundness of those de-cisions by the courts of those States in which slavery is prohibited, which give effect to their laws and constitutions in cases where there is no substantial violation of them; as when the master is merely passing through the State with his slaves; but we must concede to them the right to say that masters shall not place slaves for an in-definite time within their limits,—there to mingle with their citizens, to attend their colleges and schools, or to work at a trade. To de-mand this of them, is to demand that they shall pay no respect to their laws and constitutions. It is no answer to this course of reasoning, that the persons were minors, and not in a condition to consent to their own freedom. The Constitution of In-diana makes no distinction. That Constitution, like a deed of emancipation, in States where emancipation is allowed, is operative on men, women, and children. This position would be assented to in every State of this Union. If it be correct, then it was the foundation of a right to freedom in Francis and Jerome, which the State of Mississippi cannot gainsay. The question of James Brown's ulterior purposes or objects respecting them is wholly im-material. They were placed in a situation in which their wishes and intentions were paramount to his, in the matter of their future condition.

The slave has a compound character even here under our laws. We recognize certain rights as belonging to him; yet we are con-stitutionally prone to view him as property only. Even in a ques-tion involving his right to freedom, we do not divest him for a single moment of this character, and suffer his destiny to be controlled by the intentions of his master. If we cannot admit that at some

point of time, and in some situations, the slave is to be considered as an individual, capable of having a purpose of his own, by which he is to be judged, and capable of invoking the law in his own favor, we are incapacitated for the decision of this question. There was a point of time, when the intention of James Brown could no longer of itself, control the condition of the legatees, and that was when he placed them in a situation in which it rested with *them*, whether they would be slaves or free. They were in that situation, when he placed them at school for an indefinite time in the State of Indiana. After that time he could not compel them to return to Mississippi to reside. He could not compel them to leave that State, if they chose to remain. At that point of time, therefore, the intention of James Brown ceased to be a controlling circumstance in this cause. We must, therefore, give some attention to the conduct of the legatees themselves. In the case of *Hinds* v. *Brazeale*, if the slave had, after the act of emancipation, chosen to remain in Ohio, the intention with which the master went there, could not have continued the relation of master and slave, but the slave voluntarily returned to this State with him, and continued to reside here. This was evidence enough to involve the slave in a purpose to violate our laws. In the case in 1 Randolph, 15, the slave there, is charged with a design to acquire freedom, with a view to enjoy it in the State of Virginia.

We insist, therefore, that Brown's declarations, subsequently made, are of no importance. It is admitted on all hands, that his plan was, to educate these persons under the laws of a free State, and that he carried out this intention; and without regard to his motives, or the supposed public policy of Mississippi, these persons became free by the rightful and legitimate operation of the laws of Indiana. This right they might perhaps have abandoned, provided they had voluntarily returned to a condition of slavery in a slave State; but of this there is no proof whatever. They visited Mississippi afterwards at their own peril, and in doing so they perhaps violated the law of the State against the introduction into this State of free negroes; but that law only required them to be whipped and sentenced to leave the State. The evidence shows conclusively that while in this State they were not treated as slaves, and that they were suffered by James Brown to return to Indiana.

We repeat, that all inquiry into the particular motive of the master in taking them to Indiana to be educated, or into his ulterior views respecting them, is rendered useless on the main question. It is sufficient, that it appears that he did not assert dominion over them as slaves, after that time. Indeed, we do not see how any act or declaration of his afterwards, could affect their condition. For if we were to admit that he afterwards paid taxes on them in Mississippi, and actually desired to reduce them to slavery again, it could not alter the case. It cannot be said that the operation of the fundamental law of Indiana, can be made to depend on the caprice of James Brown. The proposition that a master may send his slaves to be educated in a free State, or to remain there an indefinite time, pursuing a trade or occupation, without occasioning any change in the relation of master and slave, would shock the intelligence of the country. Of what practical importance to them are their statutes and constitutions if a master can go there and hire his slave as a laborer, or send him there and continue him there for months and years at school ? It is vain to urge that by construction of law the domicil of the slave thus situated was not changed nor intended to be changed.

.Take the example, sometimes cited, of the law of Connecticut, abolishing slavery. One of the inducements to its passage, as stated in the preamble, was that slavery interfered with poor free laborers of that commonwealth. A slave-owner in Mississippi engages in a railroad contract in Connecticut there, and sends his slaves there, to be employed in the work for an indefinite time, but intending, when the work is completed, that they shall return to this State. If the question should arise in the courts of this State as to the legal consequence of this act, on the part of the owner, in connection with the prohibition of slavery by the law of Connecticut, and it should be made to appear that the owner did not intend to change the home of himself or of the slaves, and he repeatedly said that he intended that they should return and live in Mississippi, would these declarations, or this intention on the part of the owner vary, the result ? The only question, in such a case, would be, did the slaves, having acquired a right to freedom, assert it, or did they voluntarily return to this State to a condition of slavery ? We would say, without hesitation, that the laws of Con-

necticut must take effect, in such a case, or be totally subverted. The question of the consent of the owner would be immaterial, because the laws of Connecticut cannot be made to depend on his intentions. The result would, for a stronger reason, be the same if he sent a slave there to be educated.

The object of Brown in placing his children at school in Indiana, was not to violate a law of Mississippi. The act itself did not violate any law of this State. He sent them there because he wanted them to obtain education, and that object could not be attained here. He intended that they should have such residence there, as would effectuate this purpose. This residence, and this act, were designed to take effect there, and were not simulated. It is assumed, however, that there existed in the mind of the master, along with this purpose to educate Francis and Jerome, a purpose or wish, on his part, at least, that they should return to this State to reside after their education should be finished, and with the condition impressed upon them by the laws of Ohio or Indiana; or, that there coexisted with this purpose to educate them in the schools of Indiana, a purpose that their education should be accomplished by such change of residence only, as might be necessary to that end. And it is insisted that this purpose being in itself contrary to the laws and public policy of this State, rendered the laws and constitution of Indiana inoperative on the condition of Francis and Jerome. This position is assumed in order to bring the case under the influence of the decision of *Hines* v. *Brazeale.* The education of these persons in Indiana, and their residence there, for that object, can in no sense, be regarded as auxiliary to a residence by them in Mississippi, even if we should conclude that Brown's intention could control the laws of Indiana. It is apparent that the attempt to reduce the case to that of *Hinds* v. *Brazeale,* can be successful only by throwing out of view the respect due to the laws of Indiana, and by overlooking entirely the fact that Francis and Jerome have a right to be heard. It is obvious that in Indiana they were free persons, because their stay there, and their acts there were inconsistent with the continuance of a condition of slavery. It was the foundation of a right in them, which they could assert in opposition to Brown himself. It is perfectly evident that if, after they were placed at school in Indiana, they had chosen to decline a return to this State, there was no power to compel them to return,

Shaw *v.* Brown.

and we would be bound to admit the legal consequence wrought by their stay in Indiana. The case of *Hinds* v. *Brazeale,* as also that of *Lewis* v. *Fullerton,* proceeded upon the idea that both parties, the slave as well as the master, contemplated the fulfilment of the contract of emancipation in this State. The slave, as well as the master, was implicated by evidence of the highest certainty, in a design to acquire freedom, to be realized and enjoyed in this State. The deed of emancipation was auxiliary to the residence in Mississippi, as a free person. The object and effect of it was to add one to the number of free negroes in this State, the policy of which is averse to the increase of such persons within it.

Is there not, however, a very substantial difference between that case, and the case of a master taking his slave, a child under age, to a free State, to be there educated, having a purpose himself that the child shall return when his education is completed? The independent purpose, to be carried out in future, must be looked upon in no other light than as a mere expectation, liable to be altered or defeated by accident or caprice; a purpose dependent, not only on the impulse of the master, but liable to be defeated by the child. In such a case, we may suppose that the master may change his intention, and form the purpose of bringing back the child to a condition of slavery; but could this affect the operation of laws operating on his condition, and in his favor? These persons have, so far as the evidence shows, elected,—having the right to choose,— to remain in Indiana. In other words, Francis, arriving at the age of majority, without regard to the intentions of James Brown, but following his own inclination, does not choose *to* reside *in* Mississippi at all, under the one condition or the other. On what ground, therefore, can we say, as to him, that the laws of Indiana have not changed his condition? We have collected the decisions sustaining the views here presented from the border States, Virginia, Kentucky, Missouri, and elsewhere. *Foster* v. *Foster,* 10 Grat. 485; *Ben. Mercer* v. *Gillman,* 11 B. Monr. 211; 1 Leigh, 172; Gilm. Vir. Cases, 143; 4 Wash. C. C. 396; *Collins* v. *Amere,* 9 B. Monr. 575; 18 Pick. 193; *Rankin* v. *Lydia,* 2 A. K. Marsh. 468, 813; *Julia* v. *McKinney,* 3 Mo. 196; 16 La. Rep. 488; 11 Ib. 501; 8 Ib. 474.*

* *Thomas* v. *Givens,* 16 La. 488, is important to be noticed. The authorities here collected are leading cases.

These authorities, it will be admitted, announce the current law of the slave States on the subject. It is conceded, by the witnesses for the complainant, that Francis and Jerome, for a period of four months (and it is shown we think clearly, by other witnesses, testifying directly to the fact, for a period of two years), were, by the act and consent of James Brown, engaged in Indiana in attending school there and in other employments. During that time, the relation of master and slave was of necessity dissolved. The Constitution of Indiana, adopted in 1816, was not aimed at a particular case, and its operation cannot be controlled by the private wishes of individuals. Our own policy, on the subject of emancipation, cannot be regarded as having in any way modified or suspended the effect of that constitution. Its inevitable operation, therefore, was to sever the artificial legal ties which bound these persons to James Brown. He was not, after that, entitled legally to fix their domicil, not occupying, towards them, any relation which in law entitled him to control them, or which made his domicil their domicil. His desire to control them, the expression of an intention to direct their place of abode after that, must, of course, be considered with reference to his legal right to do so, and that had ceased to exist by his own act. The intentions, the expressions of Brown, after he had, by his own act, parted with his right to govern their movements, are eagerly sought for, as will be seen by the course of the examination of witnesses, by the opponents of the will.

But, it is apparent, that the hypothesis on which the complainant proceeded, assumed the very point in controversy. It assumed that Francis and Jerome continued slaves. They assume that they were slaves, in order to establish a constructive domicil in Mississippi, and then show by their domicil, that they are slaves. This is a method of dealing with the questions at issue, which, though it tends much to shorten our labors, is far from being satisfactory. We must follow the natural order of things. The complainants allege that Francis and Jerome were born slaves, in the State of Mississippi. We admit that, but state that they afterwards obtained their freedom. The proof is that they were so established in Indiana, by the consent of James Brown, by his act in placing them at school there, that by the inevitable operation of

the constitution and laws of that State, they ceased to be slaves. *Prima facie,* they are now free, unless it is shown that they voluntarily returned to the condition of slaves. The proof does not establish this. On the contrary, it establishes the reverse. We have shown, furthermore, a state of things incompatible with the further continuance of the relation of master and slave; a state of things, which brought about their freedom, without regard to the question of domicil; a state of things, in which it is impossible to view them as slaves, and from which their right to freedom flows necessarily, unless they are so implicated and involved in illegal acts and designs, as to have forfeited their right to assert it. The facts are far from implicating them in any illegal purpose. They were children, and slaves, when they were carried to Indiana, and placed under the operation of the laws of that State, and those laws gave them freedom. What plans they had formed for the future, we do not know. It appears that Brown desired to keep up an intercourse with them, and it is natural to suppose that they responded to the desire. It existed as the offspring of nature, and as such, we leave it, without attempting to apologize for it. It led to an intercourse, as the facts show. Brown went to Indiana to see them and provide for them there, and they came to Mississippi to see him; but invariably, with his consent, returned to Indiana. One of the visits of Francis was made, so far as appears, on business of his own; the other was made at the request of Brown, after Francis had reached his majority, and the object of it was to consult him respecting a project of settlement in Louisiana, which project was rejected by Francis, and he went back from that visit to return no more. There is no evidence from which we can infer that these children stipulated, as one of the conditions on which they were to be emancipated, that they would incur the penalty of the whipping-post, or that these visits were so connected with any plan of theirs, in obtaining their freedom, as to require us to deny to them the benefit of a plain principle of law. The visits of Francis had each an object, and seemed to spring from causes originating subsequent to his going to Indiana.

The bill, however, does not rely upon any intention unlawfully to visit the State of Mississippi, but upon an intention unlawfully to reside here as free persons. This is a question depending on the

evidence.   The fact is they do not, and did not at the commencement of the proceedings, reside here, but it is claimed that constructively they resided here, in consequence of an intention to return.   This question of residence is not, as we are taught by the decisions, to be determined by an isolated fact or circumstance, when the question is, which of the two places, claimed as the domicil, is the true domicil, but we are to take all the facts, declarations, and other circumstances together, and determine from a consideration of all of them. The declarations of Brown are not decisive, for it is clear, taking the statements of the witnesses to be true, that he spoke sometimes of Indiana, as the permanent residence of Francis and Jerome, and sometimes of Mississippi, as their home or residence.   The declarations, therefore, we may say, are inconclusive.   They leave a doubt.   This doubt must be solved by a reference to the object and the acts of the parties.   It is in proof that Brown, before he determined upon the step he took, had formed the determination to emancipate his illegitimate children, and their mother.   He had determined to educate his children, and to give them their freedom, and bestow on them his property.   In 1849, he spoke to P. R. James, of his purpose, and James advised him to settle them in a free State, and Brown declared his intention to do so.   It is in evidence also, that Brown consulted counsel in regard to his purposes before he went to Indiana, and that he had taken note of the decisions of our courts, and his declarations show, that he was thoroughly convinced that the objects he had in view could only be accomplished, by establishing the children and their mother in a free State.   He was perfectly aware that they could not safely return here after they were placed in a free State, and so expressed himself to Hoadly, the notary in Cincinnati.   He repeatedly said, that he knew that his objects could not be carried out in Mississippi, and in all his subsequent wavering speculations as to the final abode of this family, he is never heard to say that he intended it to be in Mississippi.   He took up an idea at one time, that through the action of the police jury of Louisiana, he might establish their freedom, and secure a residence there for them, but this idea never went beyond a vague speculation.

We now have his object, and we know that he was conscious that it could be effected, only by the residence of the children and their

mother in a free State.   In 1850, he accordingly carried them to
a free State, first to Ohio, where he executed and delivered to each
of them a deed of emancipation, and at that time said to Hoadly,
that it was not safe for them to return to Mississippi, and that he
intended to place them in Ohio or Indiana, for education and resi-
dence.   We find him accordingly placing them in Indiana, and
sending them to school.   They continue there for two years or
more, and then they go to Mississippi, and return to Indiana.   It
matters not how often they visited Mississippi, since it is admitted
that these visits were invariably followed by a return to Indiana.
While the children were minors, we need not look for evidence of
what is termed a home, for them ; the home of the mother of ille-
gitimate children is their domicil in law.   The evidence does not
even tend to prove that Harriet came back to Mississippi to reside,
but after the eldest, Francis, arrives at age, we find that James
Brown sets about establishing him, and purchases for him a farm in
Indiana ; and Francis,—who in the meanwhile had attended school,
and worked at carpenters' work when he could procure jobs, during
the period from 1850, to 1854, in Indiana, interrupted only by his
visits to Mississippi, of which we have spoken,—takes up his residence
on the farm procured for him in that State, and has resided there
ever since.   He went upon it to reside prior to the death of James
Brown.   It is moreover in evidence that Brown purchased property
in Indiana, in connection with the settlement of his children there,
prior to 1852 (see Shelton's statement; see also W. R. Brown
and P. R. James on the same point, *ante*) ; and that as early
as June, 1854, he sent Gillett, with money to buy land for them in
Green county, Indiana ; and although there seems to have been an
effort to show an intention to abandon this property or to sell it, it
is conclusively established that he did not, and that the purpose
with which he originally went to Indiana, has been substantially
carried out.   We most respectfully suggest, that in no other contro-
versy could such evidence fail to produce the conviction, that it was
not the intention of James Brown, that this family should return to
Mississippi, here to reside.   Can any rational mind deduce from
these facts an intention on Brown's part *to violate* our statutes or
our public policy, by incorporating these persons into the body of
our citizens or inhabitants, as free persons ?   Is the policy which

we profess to be upholding of so sensitive a nature, that it takes offence at a residence by construction of law, and not by actual presence? We agree with Mr. Crittenden, that the ordinance of '87, was made ridiculous by being employed to catch up a stray fiddler, and we are compelled to say that our public policy, as we term it, loses all its dignity, when it takes offence at the chance visit of a school boy. We are therefore naturally led to inquire, what this public policy is, of which the complainant speaks, and the nature of those acts and designs, which may be said to be in fraud of our laws, and against our public policy, as indicated by our legislation on the subject of emancipation.

The Act of 1822, defines slaves to be "persons lawfully held to service for life, and the descendants of the females of them within this State, and such persons and their descendants as may be hereafter brought into this State pursuant to law, being held to service for life by the laws of the State or territory from whence they were removed, and no other person whatsoever shall hereafter be deemed slaves." The same act provides, that slaves shall not be emancipated, except by will or other writings under seal, and only in consideration of meritorious service to the master or to the State, and by the consent of the legislature to such emancipation, and that free negroes shall not be allowed to emigrate to this State. The Act of 1831, requires all free negroes to quit the State, unless they shall obtain license to remain and security for good conduct.

The Act of 1842, provides that it shall not be lawful for any person, by last will and testament, to emancipate slaves, or to direct slaves to be removed out of this State for emancipation, elsewhere, except on the condition that the consent of the legislature shall be obtained, and in the cases heretofore provided. The same act further provides, that where any person shall hereafter take or send slaves out of this State, and shall emancipate such slaves out of this State, and such slave shall thereafter be found within this State, such person shall forfeit his right to protect such emancipated slave from incurring all the penalties of this act, or from being proceeded against as a free negro or mulatto unlawfully within this State. The penalty " for conviction of immigrating to this State," is thirty-nine lashes, and a sentence to leave this State within twenty days, and, in default thereof, to be sold for a term of years.

This is the legislation from which we are to extract the public policy of this State, on the subject to which it relates. We are not to look to a variable popular sentiment against free negroes, or to the shifting political feeling of the times, or to the influence which may be ascribed to emancipation, allowed and practised elsewhere. There is a clear declaration of a policy opposed to the increase of free negroes within this State, by emancipation or by immigration. Moreover, it may be for the sake of argument conceded, that the provision of the Act of 1842, which curtails the testamentary power in the matter of directing emancipation elsewhere, was dictated by a spirit hostile to emancipation, generally; but the same act clearly recognizes the right of the owner of slaves, to carry or send them out of the State, and thereby effectuate emancipation out of the State, by act or deed in his lifetime. When this admission is made, the question arises, why did the legislature, impelled by this spirit of opposition to emancipation generally, confine the prohibition to a particular mode of emancipation out of the State? If we say that it was because the legislature did not desire to carry its hostility so far as to infringe the liberty of the citizen, and therefore limited the prohibition, there is of course an end of the question of public policy, for that could not arise against the purpose of the legislature. If, on the other hand, we say that the legislature exhausted its power, under the constitution, the same result must follow. The testamentary power of the citizen is derived from a grant of the legislature, and may be limited and controlled by the legislature, but the right of the citizen to emigrate from the State with his property, or to go from the State temporarily with his property: in other words, the essential element of personal liberty, the right of locomotion, which includes the right to carry movable effects, is a right reserved to him and protected by the paramount law, the constitution. Creditors may seize the property, under the process of the courts, but where the right to remove it is exercised, without conflicting with private rights, no public authority can restrain it. It matters not, therefore, whether the legislature stayed its hand for want of will, or for want of power. It is manifest that the courts cannot occupy the ground left untouched by the legislature, in the name of public policy. There can be no public policy higher than the legislative will, and certainly no legislative will,

above the principles of the constitution. If, in the opinion of the law-making power, it was wrong to curtail the liberty of the citizen,— of the master, in order to rivet the fetters of the slave, that is sufficient. See *Foster* v. *Foster*, 10 Grattan, 485.

We insist, therefore, that James Brown, in carrying Francis and Jerome to the State of Indiana, with the intention that the laws of that State, co-operating with his consent, should sever their bonds and make them free, exercised a plain, constitutional right, and violated no statute of this State, and offended no public policy of this State. The laws of Indiana are not in fraud of our laws. The act of the owner was itself lawful, and these concurring, changed the condition of Francis and Jerome, and rendered them free. It matters not that Brown knew that emancipation was not permitted in Mississippi, and that he went to Indiana in order to " overcome" the obstacles opposed to his purpose by the laws of Mississippi. He did not evade our laws, but carried his slaves beyond the legitimate sphere of their operation. By the lawful act and consent of James Brown, and by force of the laws of Indiana, Jerome and Francis became free ; and it can but lower our position and the dignity of our principles, to publish impotent decrees against this inevitable legal consequence. The case of *Hinds* v. *Brazeale* is clearly right, on the ground that the deed of emancipation was executed with the intention that the right to freedom, which it conferred, should take effect and be enjoyed in the State of Mississippi, and was followed immediately by a return to Mississippi for residence, indicated by living here continuously up to the death of the testator. The case now before the court is wanting in these essential features. *Leiper* v. *Hoffman*, 26 Miss. 615. We are satisfied, therefore, that the legatees, Francis and Jerome, were not slaves when the will was executed, and certainly not slaves in point of law or fact, when the will took effect by the death of James Brown. The bequests, therefore, cannot, in our view, be held to be void on that ground.

Both before and since the Act of 1842, this court has decided that it was lawful to carry or send a slave out of this State to a free State, there to reside, and that such an act rightfully operates to emancipate the slave. In *Ross* v. *Vertner*, 5 How. 360, the court say, " It will not be contended, however, that the testator had not a right to take the slaves to Ohio and leave them there in

the enjoyment of freedom, according to the constitution of that State."

The case of Fanny Leiper has already been referred to. It may, therefore, be considered as the settled law of this State, that there is one mode of emancipation left to the master, and that it is not the policy of this State to render slavery indelible and involuntary, both as to the slave and the master. The evidence in this case shows that the master designed to resort to this mode of emancipation, and that it has been accomplished in a manner not offensive to our public policy.

The court is referred to 21 Ala. 614, as to right to emancipate; On the doctrine of alienage, see 6 Paige, 448; 3 Wheaton, 563.

*D. W. Hunt,* on same side,
Filed an elaborate brief.

*George L. Potter,* for appellee.

The case shows that James Brown, a planter, of Amite, was owner of a slave, named Harriet, by whom he had four illegitimate children, two of whom were Francis and Jerome. In the year 1850, at Cincinnati, he signed papers emancipating all these slaves, who all afterwards came back to his residence, in Amite,—he retaining, in his own possession, the free papers intended for Francis and Jerome, who ultimately settled in the State of Indiana. In October, 1853, he made his will, directing that his debts should be paid and his whole estate sold, by his executor, and the proceeds placed in the Bank of Louisiana, subject to the draft of said son Francis, or, in case of his death, of said Jerome. He died, in January, 1856, possessed of a large estate, in land and slaves, in said county. The will was there probated, and the executor assumed the trust. This bill was filed to restrain him from executing the will, on the ground that this bequest is void.

The defence is that the legatees are free negroes, denizens of Indiana, and capable to take the devise.

1st. We insist that these persons cannot, in a Mississippi court, be heard to assert their freedom, as acquired by any act of their master, at Cincinnati, nor by any subsequent act, because their emancipation was undertaken by him with the intent to return and

detain them in this State contrary to the statute. It is wholly immaterial whether that purpose was accomplished or abandoned; if the claim of these persons is founded on such illegal design, the courts of this State must reject it.

It appears that at the date of emancipation, 17th May, 1850, Francis was about seventeen, and Jerome about seven years old, and that very soon thereafter they were put to school in Jefferson county, Indiana. It also appears, that, from time to time, they returned to the residence of their father, in Mississippi.

Shelton proves the admission of Brown, " that it was his intention for them to go backwards and forwards to Indiana, to evade the laws of this State. That he had a temporary residence in Indiana for them."

Richardson proves Brown said, when he went away with them, in 1850, that his object was to " educate them," and that " he was going to bring them back, when they were done going to school."

Haygood says, " their absence was temporary, and principally to acquire an education, as witness learned from Brown and Francis."

That, after the act of emancipation, Brown employed George Gillett, and said he had engaged him " for the purpose of carrying Harriet, Francis, and Jerome, to the State of Indiana, in case of his death." Gillett says he did not know Brown until June, 1850; was employed by him from October, 1852.

Brazelton proves Brown's statement, that he had emancipated them, " in order to educate them, and that they might not be taken back to slavery, in case of his death." This is a witness for the executor. We have seen how he, prudently, employed Gillett to protect them from all danger of capture, on his demise. They were to be run out of the State.

Shelton proves Brown said, he " intended this (Amite) to be their home until his death. That he wished them to be with him."

Jacob Terris proves that Brown said, he had " brought them to Indiana in order to educate them."

Terris, a witness for executor, says he became acquainted with Brown in 1854, and had frequent conversations with him " about his plans and desires to settle them in a free State." That he

wished to educate them, and give them farms, "for a home after his death."

The agent, Gillett, says he "frequently heard Brown speak of bringing them back to Mississippi."

Shelton says, that in 1850, and again in 1852, Brown spoke of making "Mississippi their permanent home."

Smith, a witness for executor, says he resided at Brown's in 1852; that "Francis regarded Brown's residence as his home," "and Brown considered his residence as their (Francis and Jerome's) home."

Hanks, a witness for executor, proves, that when Francis left in 1854, he said, he "was leaving the State of Mississippi for the purpose of removing." Evidently, this primary legatee, who is yet living, and entitled, under the will, to the whole property, considered Mississippi as his home, until 1854.

With this broad admission, of this sole legatee, made when he was about twenty-one years of age, that Mississippi was his place of residence, it is needless to seek further proof, and vain to attempt to show that his temporary absences at school, in Indiana, constituted him a resident of that State, from June, 1850. But there is abundant uncontradicted proof to sustain this admission of the legatee.

Haygood says, their "permanent residence" was "at James Brown's, in Amite county, until the last time Francis was here, in 1854." Brown spoke of Amite county as "the home of Francis and Jerome, up to the spring of 1854." Brown paid taxes on them in 1851. In May, 1852, Brown spoke of Amite as their residence.

William R. Brown says, that in 1854, Brown "considered Mississippi as their residence."

Shelton says, "Brown considered Mississippi as their residence in the fall of 1852."

Richardson says, Brown claimed his residence, in Amite county, "as their home, up to the time he left, in 1854."

Against this proof, they bring Indiana witnesses, who consider that these persons resided in Indiana, during the time of their temporary presence there at school. These witnesses also prove certain statements of Brown, which are relied on, by the executor, to

show that they resided there at that time. But the facts of the case, as well as those statements themselves, prove that Brown only spoke of the future ; his words were prospective.

Hanks says, that in 1854, Brown said he had land, in Indiana, bought by Gillett, " for his family."

Terris says, that in 1854, he spoke of his land in Green county, Indiana, purchased through Gillett, where he "intended to reside with his family, including Francis and Jerome."

Brazelton says, Brown "intended" to buy them good farms, in Indiana.

Nelson proves, that Brown said, he emancipated them, that he "might give them an education, and set them up in a free State."

James proves, that in 1853, Brown spoke of his place in Indiana, and said he intended to go there himself, " when he could sell out."

We have seen that the boys were put to school in Jefferson county, and in 1854, we hear of Brown's purchase of land in Green county ; and it appears, that in the fall of 1854, Francis located in Green county, and Jerome in 1855. William Gillett says, Brown, himself, visited them there, in 1855, and died at the house of Harriet. After the boys had thus located in Green county, Brown said, " their residence was" there. But never before then did he assert that their residence was in Indiana.

Record says, that in 1850, Brown said, he "intended" to make Indiana their place of permanent residence.

Lucy Wilson says, he stated, that he " expected" them to reside in Indiana.

Nelson proves, he said he "intended" they should make Indiana their place of permanent residence.

Terris says the same.

William Gillett says the same.

Brazelton says the same.

George Gillett proves, that in 1850, he "intended" to educate and settle them in Jefferson.

These witnesses only show plans for the future, not at all inconsistent with the fact, deposed to by numerous witnesses, that up to the spring of 1854, Brown considered the residence of his sons to

be at his domicil, in Mississippi. It is plain, that at the outset, he intended to educate his sons, and then keep them with him, in Mississippi, until his death, and then have them removed, by his ready agent, Gillett, to a free State.

It further appears, that in 1852, he took legal advice, and found that his schemes might fail, and it is probable, that after that, he became anxious to settle them, in his lifetime, in some other State, and finally resolved to remove himself, as the witness James says, " when he could sell out."

In proof that he did not consider them settled in Indiana, from 1850, we refer to Shelton's statement, that in 1852, Brown requested him to buy a place " for him for Francis and Jerome," in Louisiana.

Gillett says, that in 1854, Brown told Francis, that if he would come down, he would buy him a place in Louisiana, where he could live. That he came down, found no place to suit, and returned to Indiana.

Richardson says, Brown told him, that Francis returned in 1854, " to look out a place in Louisiana to settle."

It is, therefore, idle to pretend that he had settled in Indiana, prior to the spring of 1854. Until that time, as he himself said, his home was in Mississippi, and not until then, did he leave " for the purpose of removing."

Haygood says the boys returned here, in the fall of 1850, and remained at Brown's until the spring of 1851. That, between 1850 and 1854, Jerome was in Mississippi about three times, and Francis three or four times; that they came in the fall, and went back in the spring ; and Francis returned twice in one year.

W. R. Brown saw Harriet and the children at Brown's, in July, 1854.

Shelton says that, in the latter part of 1850, Francis and Jerome were residing with Brown, in Amite. That, in the fall of 1852, they were there, and they resided there in 1853. In that year he met them, in Clinton, on their return from Indiana. From 1850 to 1853, Jerome spent most of his time at Brown's.

The executor produces witnesses to raise an issue upon the immaterial point, as to how often they came down.

Gillett says they came in the fall of 1852, and remained till May, 1853; that Francis was here again in 1854.

Richardson proves that Francis was here both in 1853, and 1854.

Some of the Indiana witnesses say the boys came here on a visit, in the fall of 1852, and returned in the spring of 1853; and that Francis came again, on a visit, in the fall of 1853, and returned in 1854. None of them know of any further visits. They are confident the boys did not leave Indiana from 1850 until the fall of 1852. They say that from 1850 until they left for Green county, Jerome was at school most of the time; that Francis was at school a part of the time, and part he worked as a carpenter.

It is shown that Brown gave free papers to three others of his slaves, Malinda, Tom, and Sarah: Tom has left the State, and the two others are slaves on the plantation.

Between 1851 and 1853, Haygood saw the free papers of Francis and Jerome in Brown's possession, in Amite. He had them also, in 1854.

We have seen that, in 1852, Brown took legal advice, and found he could not leave his estate to these boys, in Mississippi. Shelton says that, in the fall of 1852, Brown requested him to buy a place for him, for Francis and Jerome, in Louisiana; and said that he could not free them in Mississippi, and was going to try to do so in Louisiana. Does not this remark show the original intent to make out free papers at Cincinnati, that the boys might reside here as freemen, after completion of their education?

It seems that after he so took advice, in May, 1852, he made a will, describing them as free persons of color, resident in Jefferson county, Indiana. It was a matter of course for him, under the circumstances, not to admit a fact which would defeat the devise; but it needs no argument to show, as his repeated declarations and those of Francis prove, that their residence was in Amite until 1854. The same remark applies as an answer to the argument based on his statement to Hoadly.

From the whole proof it seems that Brown originally intended to free and educate his sons, and have them reside, at least until his death, in Mississippi. That, afterward, he was advised that his scheme must fail. That then he delayed their removal in the hope to procure them a settlement in Louisiana, and finally abandoned

that hope, and resolved to remove and settle with them in Indiana. Certain it is they returned to this State, subsequent to the act of emancipation; and that, if the admissions of Brown and of Francis are to be credited, they had their residence here until 1854. There was an intent, by means of free papers, executed at Cincinnati, to make them free in Mississippi,—an evasion and violation of her laws. To confirm such proofs, it is hardly necessary that we should rely on the repeated declarations of Brown, of his intent to "evade the laws of this State."

As the execütor and negroes claim through Brown, in privity with him, his declarations are evidence against them. Greenl. Ev. § 189.

If this alleged emancipation was undertaken with the intent to make these persons free in this State, to return them here as free negroes, the result is that the whole scheme was illegal; the attempted emancipation was null, and the intended beneficiaries cannot be permitted, in Mississippi, to claim or derive any benefit or advantage from it. In this view, it is wholly immaterial whether the scheme was carried out and the parties actually brought back to reside or not; although, as we have seen, the proof is strong to show a continuing residence here, with absences for a temporary purpose, until 1854. If such an intent existed, the deed of emancipation and all subsequent matters consequent upon it, are wholly ineffectual to confer any rights, in Mississippi, upon these persons; and the courts here must regard them, as though such deed had never existed, and as if they had never left the State. To give them the benefits of this will, would be to decree to them the fruits of the unlawful scheme. Early in 1855, Brown said that "in spite of his good friends, he would overcome the laws of Mississippi, and arrange his business in his own way, and settle his people to his satisfaction." The question is, shall his illegal scheme be accomplished, by giving his estate, through the agency of our courts, to his former slaves?

In *Hinds* v. *Brazeale*, at least two reasons were given by this court why such a bequest should not be tolerated by our courts. It was there said, "The state of the case shows conclusively, that the contract had its origin in an offence against morality, pernicious and detestable as an example. But above all, it seems to have been planned and executed with a fixed design to evade the rigor of the laws of this State." 2 How. 803.

Shaw *v.* Brown.

In *Ross* v. *Vertner*, the court, referring to this case, said, "The deed of emancipation was held void, because as a contract for freedom it was to be executed in Mississippi, whose laws and policy forbade it in the mode attempted, and because the farcical excursion into Ohio by the testator, his immediate return into this State with the slaves to his former home, and continuing there as a citizen up to his death, with the other circumstances, demonstrated his intention to evade the laws of the State and commit a fraud upon its provisions." 5 How. 359–60.

Here we see the illegal intent was held to vitiate and avoid the act.

In *Green* v. *Robinson*, it was said, " The introduction (of slaves) may in some cases be lawful; it will always be illegal, however, if the intent is to sell. The sale consequent upon the introduction, evidences the intent, and fulfils the illegal purpose." 5 How. 102; *Hope* v. *Evans*, 4 S. & M. 330–1.

Where drugs were sold to be used in a brewery, and the statute prescribed that beer should be compounded of malt and hops only, and not of adulterated materials, it was held the plaintiff was not entitled to recover. Lord Ellenborough said, " The case does not state that the drugs were in fact mixed, but they were sold with a view to be mixed; and the court will not give sanction to a contract entered into against the policy of the law." *Langton* v. *Hughes*, 1 Maule and Selwyn, 597.

Where goods are sold " for the purpose " of being again sold contrary to law, the vendor cannot recover. *Robinson* v. *Howard*, 7 Cushing, 611, n.

Money lent " for the purpose " of being applied contrary to law, cannot be recovered. *McKinnell* v. *Robinson*, 3 Mees. & Wels. 434; *Cannan* v. *Bryce*, 5 E. C. L. 256.

If it be said that a mere illegal intent will not vitiate, the following cases will show that any act, however slight or remote, in furtherance of such a design, will render the whole null and inoperative. *Clugas* v. *Penaluna*, 4 Term Rep. 466; *Biggs* v. *Lawrence*, 5 Term Rep. 455; *Wensell* v. *Reed*, 5 Term Rep. 599.

An attempt to contravene the policy of a public statute is illegal, and no right of action arises between the parties thereto. *Bartle* v. *Colman*, 4 Pet. 184.

We insist, therefore, that this bequest is void, because it is but
VOL. VI.—19

part of an illegal scheme, to free slaves contrary to law, and give them property, here in Mississippi. All the subsequent acts, up to the death of Brown, are but events incident to the illegal scheme; consequences of the unlawful attempt, and not to be separated from it. If he executed the free papers, intending the slaves should retain their home here, with him, except when temporarily absent, until his death, the mere fact that he removed them sooner than he at first intended, cannot change the character of the transaction. He and they did regard their residence as here, and they returned to it as still their home; he still paid taxes on them as slaves, and retained their emancipation papers. The case is not to be distinguished from that of Brazeale. The illegal intent was the same; and the temporary absences, and final subsequent removal, if you please, but show that that intent was not consummated as fully in the one case as in the other. The law condemns the illegal purpose, and does not vary its judgment according to the good or ill success of the attempt.

It is wholly immaterial whether the slaves are now free or not. Where a party left the State, to evade its laws, and obtained a decree of divorce, and for alimony, the courts of New York, not pausing to question the validity of the divorce, refused to enforce the decree for alimony. They said that even though the wife was freed, they would not aid her. 1 Johns. 432.

But, if it were possible to separate the subsequent acts from the original scheme, it would not avail these parties. There can be no pretence to say, that all acts done prior to November 1st, 1851, were not parcel of the unlawful undertaking. Martha Craven, their teacher, in Indiana, says: "They both attended school, through 1850 and 1851;" whilst our proof shows they were here much of that time, and taxes were paid on them here in 1851. Admit the absence for all that time,—it was for a temporary purpose. They were minors, and absent at school. If they could have a domicil, the law fixed it at the house of their father and master, in Mississippi; and they could, from such a stay, acquire no domicil or rights in Indiana.

The Constitution of Indiana, adopted in 1851, went into effect on the 1st of November, 1851.

That Constitution contains this prohibition : " No negro or mu-

latto shall come into, or settle in, the State after the adoption of this Constitution."

It further provides, that all contracts made with such negroes should be void; and persons employing them, or encouraging them to come into the State, were subject to fines.

The statute required all negroes in the State, prior to that date, to register themselves, and obtain permits of residence : 1 Code, p. 375, §§ 2, 3, 4, 5 ; and all contracts with negroes not so registered and licensed, were declared void.   Ib. § 6.

If rules of law apply in such a case, they acquired no domicil, no settlement, in Indiana, prior to November, 1851.   It has been repeatedly held, that a person residing abroad, at school, acquires no rights of settlement, but retains his former domicil.   It has been held that the domicil of a minor is not changed by an absence of seven years, there being no evidence of an intention not to return. 4 Greenleaf Rep. 47 ; *Heistard* v. *Kuns,* 8 Blackf. 345.

We say, then, these persons, having acquired no rights in Indiana, prior to the operation of the Constitution, were excluded, perpetually, by it; went there afterward and yet remain there in violation of it.   Being in that State contrary to its fundamental law, their very entrance into the State being prohibited, it is vain for them to pretend that, by their subsequent, clandestine, and illegal, entrance into its territory, they acquired any rights by operation of its laws, —that they became free negroes in a State which denied them any access, at all, in that capacity.

It was the boast of an English judge, that a slave was free because he had touched the soil of England ; but if he might not lawfully enter that dominion, if access had been prohibited, what then ?

In this connection it may not be useless to notice what were the laws of Ohio at the date of the visit to Cincinnati.   By the Code of 1841, a negro could not settle or reside in that State, unless he produced record evidence of his freedom : p. 592, § 1; and without such proof, none could hire or employ him : § 3.   A negro could not settle, without giving bond ; and none could harbor or employ him.   Ib. p. 593–4.   He could not gain a settlement : Ib. 635, § 2 ; and all negroes were excluded from the common schools : 824, § 1. It was also required that a record should be made, in the State, of

his free papers: p. 594.   The rule as to acquiring a settlement in that State, was as we have before stated it.   *Henrietta* v. *Oxford*, 2 Ohio, 32.

At this point, it is proper to ascertain the Mississippi rule, as to the effects of free territory in divesting rights of property.   Shall we admit the English rule,—the rule of most of the free States ? We say not.   When, then, does a slave, taken by the master to a free State, become free?   The courts of Virginia have intimated that it is only when such slave becomes, with the master's consent, " one of the permanent members of that State." *Lewis* v. *Fullerton*, 1 Rand. 22.

The Kentucky court has said : " We are of opinion, that, in the absence of any special legislation on the subject, the period of the slave's remaining in Ohio, is only important as it may bear upon the question, whether the slave was there for a merely temporary purpose, or for such a purpose, or with such privilege, as to the period of his stay, as would make him, in substance, an inhabitant, and thus show that he was essentially identified with the population of the State, for whom its institutions were intended.   If America was sent to Ohio, as her home, or with the privilege, by consent of her master, of living there, or of making it her home, or for the purpose of being free, or under any circumstances which should, in reason and justice, identify her with the institutions of Ohio, she became free, by operation of the fundamental law of that State, as soon as she entered its territory." *Collins* v. *America*, 9 B. Mon. 575.

We have seen that, after November, 1851, these persons could not become " inhabitants" of Indiana, nor " identified with its population or its institutions."   They could not enter the State, much less could they become " permanent members" of it ; nor did they attempt to do so, at least not until 1854.   Their presence, at the date of their visit, was odious to the population of Ohio.   They could gain no settlement there ; nor lawfully enter there, without giving bond ; nor even remain there as dwellers by sufferance, without record proof of freedom, and that proof there duly recorded. Add to this, that Brown did not there surrender his dominion over them, but removed them from that State.   If, then, we lay out of view the illegal intent to evade our laws, and look only to the fact that Ohio refused to accept or receive them as inhabitants, and

Brown refused to leave them there, how shall it be said these slaves became free at Cincinnati? If they were sent to school in Indiana, —sent there for a temporary purpose, while Brown still claimed and asserted control over them, and paid taxes on them, expressing a desire, as late as 1852, of freeing them in Louisiana, how shall it be said that, prior to November, 1851, they became, with the consent of Brown, "inhabitants" of Indiana, or "identified with its institutions?" How could they, after that date, become free there, contrary to her laws? If they are free, it is because they became free, in one of those States, with the consent of Brown. When, where, and how, did they become free?

II. But suppose them free, and the intent of Brown, in the matter of their emancipation, such as our courts would not condemn. Can this bequest to foreign free negroes be sustained? It is important, in the first place, to ascertain what the will gives them. The testator appoints an executor, and directs his debts to be first paid; his entire estate, consisting of lands and slaves, to be sold, and the residue of the proceeds, after payment of debts, to be paid into the Louisiana Bank, subject to the order of Francis Brown. We submit that if the bequest is valid, Francis Brown, the free negro, as they say, can pay the debts and take the property in kind. He may elect that the estate shall not be sold,— may pay the debts, and take the Mississippi plantation and slaves. We say, if he has the privileges of an ordinary devisee, of the residue, he may do that. 2 Lomax Ex'rs. 169; 1 Jarm. 134. Can a foreign free negro, under our laws and policy, hold slaves in Mississippi?

They are carefully excluded from the State as dangerous to that part of our population, and it is against our policy to permit negroes to have any influence or control over our slaves. They cannot vend "goods, wares, and merchandise" within this State: Hutch. 948, § 4; and all the cotton and crops they might raise would fall within the list of articles they are prohibited to sell, if a general meaning be applied to those terms.

In *Davis* v. *Evans*, Judge Scott held, that even a resident free negro could not hold slaves, under the laws of Missouri, because, "it is against their policy, and in its tendency subversive of all the police laws for the government of slaves." 18 Missouri, 249.

It has been said, the free negro, in the South, has "no civil, social, or political rights or capacity, whatever, except such as are bestowed on him by statute; can neither contract, nor be contracted with." *Bryan* v. *Walton*, 14 Geo. 197, *et seq.* They are "a subordinate and inferior class of beings," who have "no rights or privileges, but such as those who hold the power and the government may choose to grant to them." *Dred Scott case*, Pamp. 404 –5, 412. This court has declared them "offensive" to the State. 2 How. 842.

By the Act of 1831, all free negroes, over sixteen and under fifty, were banished from the State, never to return, "under any pretence whatsoever." Hutch. 533. There was a proviso to this enactment, not material to be considered. This act, and various other statutes, enacted from time to time, are full to prove the truth of the descriptions above quoted. Here, in Mississippi, they constitute no part of the legal population of the State, and are generally classed with slaves, when referred to in our legislation. If they can contract, acquire, or possess, it is rather by connivance than by force of any actual, acknowledged right. Such are the residents.

Since the Act of 1842, a free negro cannot enter the State, "under any pretence whatever." Hutch. 538, § 3. If a slave be taken out and emancipated, as they claim these were, and afterward returns to the State, he is to be driven forth, with stripes, into perpetual banishment. Hutch. 537, § 2.

Can it be said that a being, so degraded and proscribed—an outlaw forever—may take and hold estates here? That he, whose presence is so dangerous to the State, as tending to insubordination and violence among our slaves; that he, thus hated and driven forth as a dangerous enemy to the public peace, and that he may not tamper with or corrupt our slaves, is capable to take and hold slaves here, and even, through the agency of another, direct and control them?

Analogous cases, in the law, clearly show that such persons, thus perpetually excluded from the State, as enemies to its peace, cannot be regarded as capable of acquiring any property here, by will or otherwise. An outlaw cannot sue, "for, by his contumacy, he is out of the king's protection." 7 Bac. Abr. 345. He cannot acquire property. Ib. 338.

An alien friend may enter the country and traffic, and he may sue,—that is, he may maintain a personal action as being allowed to traffic. *Openheimer* v. *Levy*, 2 Stra. 1082.

"The law doth distinguish between an alien, that is a subject to one that is in league with the king; and true it is that an alien enemy shall maintain neither real nor personal action, until both nations be at peace; but an alien that is in league, shall maintain personal actions; for an alien may trade, traffic, buy, and sell, and therefore, of necessity, be of ability to have personal actions." Co. Lit. 129, b.

An alien enemy, resident under a safe conduct, "may maintain an action, for suing is but a consequential right of protection." *Wells* v. *Williams*, 1 Salk. 46; Foster, 185.

"An alien enemy has no standing in court, to acquire even inchoate rights." 2 Gallison, 11.

"Alien enemies have no rights, no privileges, except by the king's special favor, during the war." 1 Bl. Com. 372.

We have seen that free negroes stand in the same predicament, —"no civil, social, or political rights or capacity, except such as are bestowed on them by statute." 14 Georgia, 197.

In Calvin's case it was said, "Every alien is either a friend, that is in league, &c., or an enemy." "An alien friend may, by the common law, have, acquire, and get within this realm, by gift, trade, or other lawful means, any treasure, or goods personal, whatsoever, as well as an Englishman, and may maintain any action for the same. For, if they should be disabled to acquire and maintain these things, it were, in effect, to deny unto them trade and traffic, which is the life of every island. But if this alien becomes an enemy, then he is utterly disabled to maintain any action or get anything within this realm." 7 Coke (vol. 4), 33.

"Any subject of a foreign prince, being in league, may come into England without license." Ib. 36. He enters by favor of the friendly league between the governments; but, anciently, he was required to have special license to enter, and to record the same in chancery. 4 Inst. 152.

No person, not a subject, had the right, as of course, to enter the kingdom, in ancient times; much less had he the right to take or hold property. But the government, as it might see proper,

issued special licenses—safe conducts—permitting strangers to enter, and in some cases, to buy and sell. It was provided, in Magna Charta, that "All merchants (if they were not before openly prohibited) shall have their safe and sure conduct to depart out of England, to tarry in and go through England, to buy and to sell, by the old and rightful customs, except in time of war." 2 Coke Inst. (vol. 4) p. 57. And this clause was held to refer to foreign merchants. Ib. We thus find reference made, in the days of John, to " the old and rightful custom" of granting foreign merchants safe conducts " to buy and to sell." And, 9 Edward 3, c. 1, express authority was, by statute, to that effect, given to " merchant strangers and others." 1 Stat. at Large, 212 ; Coke Rep. 33.

In *Daubigny* v. *Davillon,* it was said, " They (aliens) come into this country, either, as was formerly the case, with a letter of safe conduct, or under a tacit permission, which presumes the authority. If the right of suing for injuries was not allowed them, the protection would be incomplete, and merely nominal." Anstruther Rep. 467. See also, Comyn. Dig. tit. Trade.

Thus, these ancient records show, that formerly, strangers had no privilege to enter England, except by special license ; no right to buy or sell, nor power to take or hold property, unless specially authorized so to do. And it was commerce which opened the barrier of exclusion.

It is said in Bacon, " Although, by the policy of our constitution, aliens lie under several disabilities, and are denied, in many instances, the benefit of our laws, yet are they here, as in most other countries, allowed to trade and merchandise." Bac. Ab. 554 ; Merchant, A.

Lord Hale said, " The law of England rather contracts than extends the disability of aliens ; because the shutting out of aliens tends to the loss of people, which, laboriously employed, are the true riches of any country." Ib. 555.

We have seen, their right to sue was admitted as incident to their right to trade there. But in the time of Littleton, it seems to have been otherwise. He says, " There are six manner of men, who, if they sue, judgment may be demanded, if they shall be answered, &c. One of which is, where a villeine sueth an action against his lord." Sec. 196. " The second is where a man is outlawed," &c.

Sec. 197. " The third is an alien, which is born out of the ligeance of our soveraigne lord the king; if such alien will sue an action, real or personal, the tenant or defendant may say, that he was borne in such a country, which is out of the king's allegiance, and aske judgment if he shall be answered." Sec. 198. " The fourth is a man who, by judgment given against him upon a writ of pre-munire, facias, &c., is out of the king's protection. If he sue any action, and the tenant or defendant shew all the record against him, he may aske judgment if he shall be answered; for the law .and the king's writ be things, by which a man is protected and holpen; and so, during the time that a man, in such case, is out of the king's protection, he is out of helpe and protection by the king's law, or by the king's writ." Sec. 199, &c.

Coke adds, " It was provided, by law, that a man might do to him as to the king's enemy, and any man may lawfully kill an enemy." Ib.

We see that Littleton denies the right of an alien to sue; his words include all aliens, whether enemies or not; and we find that, as late as 6 Hen. 8, it was questioned, by plea, whether a French-man could sue in England. 1 Dyer, 2, b. pl. 8. It seems to have been considered that one born " out of the ligeance," was " out of the king's protection" — the duty of obedience by the subject in-volving the obligation of protection from the sovereign; and that the alien, like the subject under judgment in premunire, was " out of help and protection by the king's law."

If we refer to yet earlier times, we see, more distinctly, the feel-ing of hostility with which people of different kingdoms regarded each other.

" Among the Greeks and Romans, the terms barbarian, stranger, and enemy, were synonymous. Nothing but positive compact ex-empted the persons of aliens from being doomed to slavery the mo-ment they passed the bounds of one state, and touched the confines of another. And though, according to the Roman law, in its im-proved state, an alien, with whose country the relations of friend-ship and hospitality did not exist, was not technically considered an enemy, *hostis*, yet his person might lawfully be enslaved, and his property confiscated, if found in the Roman territory." Wheat. Law Nat. 1.

This idea, or usage, long existed in a modified form, as proved by the law of escheatage, which precluded the foreigner from all right of succession, or to take by will; and which Grotius declared had "descended from those times when foreigners were almost considered as enemies." Vattel, p. 176, § 112.

This law prevailed in Mississippi, in cases of intestacy, until 1816. The act of 1811 provided for escheats, in case of intestacy, where there were no lawful heirs "within the limits of the United States." Hutch. 629, art. 1.

It seems to be yet the law of France. 1 Cushing's Domat. 147, n.

Thus the more ancient rule was, that all strangers were regarded as in the class of enemies. Then came national leagues, which modified, but did not destroy, the rule. Then came. safe conducts, and permits to buy and sell, causing, gradually, an extended intercommunication, which has since become continuous, binding peoples in the bond of brotherhood. And it is easy to see how the privilege of sale and purchase, once limited to merchants, became, in process of time, extended to all friendly strangers. And we are not left to inference on this point. In *Welles* v. *Williams*, it was declared, "The necessity of trade has modified the too rigorous rules of the old law, in their restraint and discouragement of aliens. Commerce has taught the world more humanity." 1 Ld. Raym. 282.

Calvin's case declares the same reason of policy. The friendly alien should be permitted to take and hold personal estate, and to sue, in England; because, said the thrifty judges, "if they should be disabled to acquire and maintain these things, it were, in effect, to deny them trade and traffic, which is the life of every island."

It should be noted that this state of enmity did not, anciently, imply a state of actual war. Lord Coke regarded the heathen as children of the devil, and therefore natural enemies of the English. *Calvin's case*, 33.

And it was declared broadly, in that case, "Every alien is either a friend, that is in league, &c., or an enemy." Ib.

This ancient idea of enemies, without war, enmity in time of actual peace, was not limited to subjects of organized governments, but extended to individuals, regardless of nationality. In *Wells* v.

*Williams*, the court said, " A Jew may sue at this day, but heretofore they could not, for then they were looked upon as enemies." 1 Ld. Raym. 282.

None but the friendly alien, the stranger whose king was in league with the English king, could enter England; and to secure him entrance, a safe conduct was necessary; and a special license to enable him to take and hold personal property; while, to this day, he cannot hold real estate. On the other hand, all other aliens, whether there was actual war or not, were excluded; they could not enter, nor take or hold property.

The rule of these cases is, that the alien or stranger, he who is not a subject of the particular government, has no right in a foreign country, except by license; and it matters not whether those rights depend on the olden special permits, or upon a presumed authority, or upon the common privilege of treaties, or upon the law of nations, it is still a matter of consent and license. It is only by consent, and because he is under protection of the particular government, that he may enter, or take, or hold property, or sue. It is, as we have seen, otherwise with the outlaw, because " he is out of the king's protection;" while even an alien enemy, resident under safe conduct, has privilege to sue, &c., " for suing is but a consequential right of protection." On the other hand, aliens, not licensed, have " no rights, no privileges." We thus trace the right of the alien, or stranger, to enter, to sue, and to acquire and hold personalty, to this permitted entrance, and special license to acquire property, and to the protection extended to him during his sojourn; while he who enters without permission, express or implied, stands like the outlaw, possessing " no rights," and " out of the king's protection." We have seen, from Calvin's case, that the right of the friendly alien to acquire personal property, in England, is consequent upon his right to trade there; and that it was expressly authorized by ancient statute. The English policy is to encourage the friendly alien to come " for trade and traffic;" and therefore they allow him to acquire and hold personal estate there. But suppose that friend becomes an enemy: the license is withdrawn; the friendly traffic ceases; he is excluded from the country; and Calvin's case tells the consequences. " He is utterly disabled to maintain any action, or to get anything within this realm."

If we desired to encourage foreign free negroes to come here, "for trade and traffic," we might adopt the English rule as to friendly aliens, and permit them "to acquire and maintain these things:" but our policy is the direct reverse: we treat them as alien, perpetual enemies, and banish them forever. The consequence is, they are "utterly disabled to maintain any action, or get anything within this realm." They stand in the ancient predicament of the Jew, "looked upon as enemies;" and our courts have declared them "offensive" to this sovereignty; the legislature has declared perpetual hostility against their presence; and, with few special exceptions, has banished even the native born, *en masse.* It is said, in Calvin's case, "A perpetual enemy cannot maintain any action, or get anything within this realm." 33. He is perpetually excluded, as free negroes are; and therefore he cannot enter, nor trade, nor acquire property, nor sue.

An alien enemy cannot maintain an action, even in the name of a British subject. *Brandon* v. *Nesbit*, 6 Term Rep. 23.

In New York, it was held he could not take as distributee, though the alien intestate has resided there by permission. The minority of the court only urged the right of the aliens to take "as a consequence resulting out of privileges granted to the intestate by our government, before his death." But the majority rejected the claim. *Broadwell* v. *Weeks*, 13 Johns. 3.

Vattel argued that property in an enemy's country should be protected, because the sovereign, "in permitting them (aliens) to purchase and possess those goods, has, in this respect, admitted them into the number of his subjects." Vat. 322. Foreign free negroes can never hold that relation to a government which excludes them wholly.

It is vain to urge, on behalf of these foreign negroes, that the ancient rigor of the common law rule is now greatly relaxed; and that friendly aliens, though not in formal league, are permitted to enter and possess. It would be wholly immaterial, if all other aliens were clothed with full privilege of citizenship. The law would still remain to be applied, when a like state of fact should exist. And wherever persons, or a people, are excluded, and especially where that exclusion is perpetual, and all entrance unlawful, those ancient legal consequences must still follow. It were a strange

anomaly, if a party perpetually excluded from the king's dominion, might still, lawfully, enter the king's presence, in the king's court.

We have seen it makes no difference, whether the alien enemy attempts to sue in his own name, or in the name of another; or whether he claims as distributee, through the agency of an administrator, or otherwise: his claim is universally, and wholly, rejected; he is "disabled to get anything within the king's realm." Where the law denies him the privilege of actual presence, the law will not consider him as constructively present; nor permit him to appear by attorney. The courts ignore him, utterly; he has "no rights."

We conclude, therefore, that a foreign free negro, who is perpetually inhibited the State, can neither sue, nor get anything, within it; and that so, this bequest is void.

As the presence of these parties in Indiana was in like manner perpetually forbidden, these reasons are a full answer to the pretence that they acquired any rights there, after November, 1851; and we might urge them against any claim of rights acquired in Ohio.

This disability of the alien enemy is founded on a rule of policy, created "for the advantage and security of the government;" and the alien's property is to be retained "during the war." So said the minority of the court, in 13 Johns. 6. It is there also said: "The soil is a portion of its dominion, and allegiance to the government, on the part of the owner, cannot be dispensed with: they are inseparable; and the safety of every community forbids the introduction of a measure which would inevitably give a permanent influence to persons not interested in its destinies." This is said in explanation of the rule, that an alien friend cannot hold lands. As to an alien enemy, it is considered as of course, that as he cannot lawfully enter to take, he cannot acquire. Surely, the same rule of policy which forbids a friendly alien to hold lands, will preclude a foreign free negro from taking lands or slaves, in Mississippi. In Alabama, because of a statute excluding them, it seems to have been admitted that foreign free negroes cannot take lands, in that State. *Tannis* v. *St. Cyre*, 21 Ala. 449.

The fact that, here, the executor is empowered to sell and pay over the proceeds, can make no difference. *Roper* v. *Radcliffe*,

9 Mod. 167, opinion; Ib. 181; *Foundrin* v. *Gowdey*, 9 Cond. Chan. 100. See discussion by a divided court, 5 Munf. 117.

III. These persons, regarded as emancipated slaves or as foreign free negroes, are banished forever from this State. Hutch. 537, 8, § 2, 3.

What is the consequence? "An abjuration, that is, a deportation forever into a foreign land, like to profession, is civil death." If a person is banished forever, "this is civil death." Co. Lit. 133 a.; 2 Bl. Com. 121.

"It has been uniformly considered that banishment, or abjuration, is civil death;" and in such case, the wife may sue for her dower, and convey her land. *Rhea* v. *Renner*, 1 Pet. 108.

Where a party is banished, and so civilly dead, the consequence is, that his estate passes to his heir and administrator, and his widow may marry, as if he were actually dead; and if he be restored again, he does not regain either estate or wife; the heirs and distributees retain the one, and the second husband the other. *Platner* v. *Sherwood*, 6 J. Ch. 128, 9; *Denning's case*, 10 John. 232; *Wright* v. *Ex'rs of Wright*, 2 Dess. 244.

Why this result? It follows, of necessity, from the fact of perpetual exclusion from the realm. He has been driven forth never to return; and, like an alien enemy, he has, and can have "no rights" there. The law excludes and ignores him; thenceforth regards him as dead.

It is impossible to say that these persons, whether regarded as slaves unlawfully freed, or as foreign free negroes, have, under our statutes and policy, any rights whatever within this State. They stand denounced by statute—perpetually excluded, civilly dead; and, being thus incapacitated to take, the bequest is void.

As to their status abroad, that is wholly immaterial, and will neither augment nor diminish their privileges or capacities here. We may remark, however, that they do not pretend they gave the bond necessary to justify their entrance into Ohio; nor had their free papers recorded, as required by the laws of that State. Nor do they show any registration of themselves as residents of Indiana prior to November, 1851, as the laws of that State require. It is true, they produce one witness to swear that they enjoy all the privileges of "free white citizens" of Indiana; for response to

which we refer to the Code of that State, which denies them any such rights.

If it be urged, that these questions, as to the capacities of free negroes, were decided in their favor, in *Leiper* v. *Hoffman*, we answer that no such question was before the court. The defendants, there, alleged that Leiper was a slave; and thus only denied her right to claim as a free negro. This defence was an admission that a free negro had such right. The question of capacity, as a free negro, was not raised in the court below, nor in this court, but was tacitly admitted. ·This court has repeatedly held, that it will regard no question not raised by counsel; and especially none not made in the inferior court.

But if that case be regarded as a decision on the points, there can be no pretence to say the grounds here presented were considered in that case; and the importance of the question, as affecting the policy of the State in a most important particular, would justify a reconsideration of the subject, and the adoption of such rule as will best promote the interests and policy of the State.

*H. F. Simrall* and *H.* and *W. S. Cassidy*, on same side,

Filed an elaborate brief, in which they contended for, in substance, the same positions relied on by Mr. Potter. They cited and relied on the following authorities :—

*Roper* v. *Radcliffe*, 9 Leach Rep. 198 ; 13 J. R. 6 ; 7 Cok. R. · 17 ; 21 Ala. R. 463 ; 3 T. R. 454 ; 4 Ib. 466 ; *Horner* v. *Hoor*, 9 S. & M. 247 ; *Read* v. *Manning*, 30 Miss. R. 319 ; *Hinds* v. *Brazeale*, 2 How. 842 ; *Jackson* v. *Jackson*, 1 J. C. R. 425.

HANDY, J., delivered the opinion of the court.

This bill was filed by the appellee, claiming to be one of the next of kin of James Brown, deceased, to enjoin the execution of certain trusts in the last will and testament of James Brown, which are alleged to be illegal and void.

The bill alleges that the testator, who had been domiciled in Amite county, in this State, for more than twenty years before his death, and the owner of a plantation and slaves in that county, died in January, 1856, leaving a will bearing date 9th October, 1853, which was admitted to probate in April, 1856; and that the appel-

lant, who was appointed one of the executors, took upon himself the office and was about to proceed to execute the trusts of the will; that the will directed the executor to sell the land and slaves of the testator as soon as it could be conveniently done, and after paying the debts, to deposit the residue of the proceeds of the sale in the Bank of Louisiana, subject to the draft of Francis M. Brown, and in case of his death, to the order of Jerome M. Brown.

The bill alleges that Francis and Jerome Brown are slaves belonging to the estate of the testator, and that the bequest for their benefit is void, against public policy, and in fraud of the laws of this State; that the testator, among other slaves, possessed a woman named Harriet, the mother of said Francis and Jerome, whom the testator claimed to be his sons; that in 1849 the testator, with intent to evade the laws of this State in relation to emancipation, carried said Francis and Jerome with him to Cincinnati, in the State of Ohio, and there, with intent to emancipate them in fraud of the laws of this State, and then to return with them to reside in this State, executed a deed of emancipation in favor of said Francis and Jerome, and then returned from his visit to Ohio, with them to this State to reside, and that they are still slaves and property of the estate of the testator, notwithstanding the effort to emancipate them; that the testator died unmarried, leaving no legitimate children or descendants, and that the appellee, with other brothers and sisters, are entitled, as next of kin, to his estate as in case of intestacy, the bequest in favor of Francis and Jerome Brown being void.

The executor answered, admitting many of the allegations of the bill, but denied that in 1849, the testator took Francis and Jerome to Ohio with the intention charged in the bill, and states that in 1849 he started with them to that State, intending there to emancipate them, but owing to the low stage of the water, he failed to reach there, and returned to this State, bringing them with him, but that in the spring of the year 1850, he did take them to Cincinnati, in Ohio, for the purpose of giving them their freedom, and on the 11th May, 1850, executed and delivered to them there, deeds of emancipation, and without returning with them to this State, did about the first of June of that year settle them in the State of Indiana, where they have resided ever since; that it was not his intention that Francis and Jerome should return to this State to

reside, and in fraud of our laws, and that up to this time neither of them has resided in this State since 11th May, 1850, but from that time they have resided either in Ohio or Indiana, with the consent and permission of the testator. He denies that the said Francis and Jerome are slaves, or that it was the intention of the testator that they should return to this State to reside.

Upon the hearing, the court below held the bequest in behalf of Francis and Jerome to be illegal and void, and decreed a perpetual injunction of that bequest; and from that decree this appeal is taken.

The case presents several questions, both of law and of fact, of much importance; and the depositions are numerous and relate to many incidental matters of a minute character, insomuch that a correct view of them could not be presented without unnecessary prolixity. We will, therefore, merely notice the testimony in a general way, as it may be necessary to the consideration of the questions involved in the case.

It is to be observed, that, although the validity of the bequest in favor of Francis and Jerome Brown, is the immediate subject of the controversy, yet that depends upon the validity of their emancipation. And the hypothesis upon which the bill is founded is, that they were taken by their owner to the State of Ohio, for the purpose of being emancipated there, but with the intent of bringing them back to this State, where they might be free, in violation of our laws and policy.

I. The first question, therefore, to be considered is, whether they were taken away and emancipated out of this State *with the intent of being brought back here as free persons.* This being a question of intention, it must be determined by ascertaining what was the object intended by Brown to be accomplished, and by examining his acts and declarations, showing the manner in which he intended to effect his purpose, and the circumstances connected with the transaction.

His object undoubtedly was, to give freedom to the persons mentioned. It appears that he was desirous of making them free in this State; but he was aware that that was impracticable under our laws. He was also aware that he could not bring them back to this State, after he had emancipated them out of the State, and he so stated to the notary before whom he executed the deeds in

Cincinnati.   It is proved by the witness Shelton, that he had consulted two respectable lawyers before he removed the slaves to Ohio, in relation to setting them free; and in consequence of the advice given, that he took them out of the State for emancipation. Thus he was apprised of the necessity of taking them out of the State, in order to make them free, and of the hazard of bringing them back here, after he had emancipated them.   It must be presumed that he acted with reference to this knowledge, in executing the deeds; and accordingly it appears that, at that time, he declared to the notary, that his object was to settle them either in Ohio, or Indiana, for *education* and *residence*, and that he would himself return to this State.

He purchased a tract of land for them in Indiana, before his return, which he said was to be their future home; and although the witnesses in behalf of the appellee state, that they returned with him to this State in 1850, it is clearly established, by numerous witnesses both in this State and in Indiana, that they did not come to this State until September, 1852, but, in the mean time, were placed at school in Indiana.   Upon the important point, whether they returned with Brown to this State in 1850, the proof is full and circumstantial; and, notwithstanding the positive testimony of the witnesses for the appellee to the contrary, places it beyond doubt, that they did not then return, but were left in Indiana, and put to school there by Brown, who *then* declared that his object was, to educate them, and *to settle them there.*

It is also clearly proved, that Jerome was in this State but once after his removal to Indiana, and that was from September, 1852, until May or June, 1853, when *he returned to Indiana*, where he was first located; and that he has since continued to reside in that State: that Francis first came back to this State about December, 1852, and remained here whilst Jerome was here, and returned with him at the time above stated: that he was subsequently in this State, in the year 1854, but never since that time: that he then returned to Indiana, where he has continued to reside; and that he and Jerome have acted as residents of that State, and have been so considered by the people in the vicinity of their residence there.   During all this period of time, Brown uniformly declared that they were free; and during their visits to him, and abode at

his house in this State, they were not treated as slaves.  He after-wards furnished money with which to purchase a tract of land in Indiana for Francis, after he became of age; the purchase was made, and the land was in the possession of Francis as his pro-perty ; and Brown went to Indiana, and died there at the residence of Harriet, in January, 1856.

With regard to his declarations in relation to the place of resi-dence of the parties, they appear to be various and inconsistent, as they are shown by the testimony.

It is stated by the witness Richardson, that Brown told him, at the time he took away the slaves in 1850; that his object was to educate the children, and that he intended to bring them back when they were done going to school.   This is the only declaration shown as having been made before, or at the time of the removal and emancipation, or while that act was in the course of accom-plishment, tending to show that it was done with the intention of bringing them back to this State.   It is certainly not reconcilable with his other repeated declarations made upon the subject, or with the object which he intended to effect, but fatal to it, upon a ground of which he appears to have been fully aware, and to have intended to obviate.   It is, therefore, not reliable as affording a just indica-tion of his intention at the time he executed the emancipation; and it is most reasonable to suppose that, if he had such an in-tention, when he was about to take them away, he afterwards aban-doned it.

Many other statements are shown to have been made by him subsequently, to the effect, that their residence in Indiana was temporary; that their permanent residence was at the home of Brown, in this State; that he claimed his residence as their home; that their absence was for the purpose of educating them; that "he took them to Indiana to have them emancipated, and evade the laws of this State, and purchased a piece of land for them, which was to be their future home;" and that he returned to Mis-sissippi, and they were afterwards with him here, and he intended this to be their home until his death, as he did not enjoy his health in Indiana.

These declarations are, for the most part, testified to by the wit-nesses Haygood, William R. Brown, and Shelton,—two of whom

are relatives of the deceased,—who show, by their testimony in relation to the return of the parties to this State, with Brown, in 1850, which is positively disproved by a great number of witnesses, that their recollections of facts are not to be implicitly relied on. It is, however, not improbable that Brown made use of expressions in relation to the children, which might have been understood as they are stated by the witnesses. Infatuated or debased as he was, it is not improbable that he made declarations, after he had separated the children from him, showing that it was his intention, as it certainly was his desire, to have them with him, if it could have been done consistently with his paramount object of setting them free. It is not strange that, under such circumstances, he made use of inconsistent expressions as to his feelings or intentions. This is rendered probable by the declaration testified to by Shelton, which would show that, although his intention, in taking them to Indiana, was to provide a permanent home for them, and that he had accordingly purchased a residence for them, "which was to be their future home," yet that, after they came to Mississippi, he determined that their home should be here until his death.

But the declarations relied on by the appellee, could not be permitted to prevail, as exponents of what he had already done and his intention in doing the act, in derogation of the rights of others, —against his positive declarations, made at the time,—against his reasons, stated at the time, negativing the intention to bring the children back to this State,—and against the course of conduct which he actually pursued towards them after their removal, in relation to their residence.

His *object* would have been frustrated by their remaining residents of this State after their emancipation; and he believed that, if they were brought back to this State, their emancipation would become void, and they would be reduced to slavery. He must also have been aware that they could not come here to reside, as free negroes, though their manumission was valid in Ohio, for that was prohibited by our laws. How, then, was it possible that he could have expected them to retain their residence here, and for what purpose could it have been retained, consistently with his main object? It is not easy to conceive what could have been his meaning, in saying that this was their permanent residence or their home; for that

was suicidal to his object.   Such vain and unaccountable expressions are, therefore, entitled to but little significance against his plain acts.

The *facts* show that they never did come back to this State except temporarily, and that they returned hence to Indiana, where they had taken up their residence, and never resided in this State after May, 1850.   Their acts, as well as those of Brown, show that that was regarded by him, and them, as their place of residence.   He purchased land for them there, which they possessed; their mother resided there, and he visited them there, and died there.   When, at one time, he became dissatisfied with Indiana, he expressed a desire to remove them to Louisiana, but not to this State; and afterwards became reconciled to Indiana, and expressed his wish to remove there to reside, when he could sell his property here.

But in addition to these facts, and his declarations contemporaneous with his acts, in relation to their manumission, there are other declarations, made when he accompanied them to Indiana, to establish them there as free persons, and subsequently, which fully counterbalance the declarations relied on to show that their residence there was merely temporary, to evade the law, and that their true domicil was in this State, and show, that he intended to establish them permanently to reside in Indiana.

Numerous witnesses in Indiana, state that Brown declared, when he took them there in 1850, that he *intended* to make that their permanent place of residence.   The force of this testimony is attempted to be destroyed, on the ground that these statements referred to his *plans for the future*, and not to his present design in taking them there.   But this is, obviously, not the meaning of the witnesses.   They speak of what Brown stated to them at the time, to be his intention then, in relation to the children, in taking them there.   He stated to James, in this State, in 1853, that he had purchased a place for them in Indiana, and wished them to remain there, but that some of them had returned against his wishes. Shelton states, that he said he had purchased land for them in Indiana, which was to be their future home, but that after they came to Mississippi, he wished them to remain here till his death.   He stated to Gillett, that his object in taking them to Indiana, was to enable them to hold property, which they could not do in this

State, and that that was his reason for wishing to settle them else-where. Hanks states that Brown recognized Indiana as the home of Francis in 1854. And, in May, 1852, he executed a will for the benefit of Francis and Jerome, describing them as *residents of Jefferson county, Indiana.* This is a solemn declaration, not de-pending upon the uncertain recollection of witnesses, is in keep-ing with nearly all his acts, and is, therefore, entitled to much weight.

But, it is said, that the declaration of Francis, made in 1854, when he left this State, that "he was leaving this State *for the purpose of removing,*" shows that he considered that his previous residence was here. This statement appears in the deposition of the witness Hanks. It does not appear that any particular force was intended to be given to the word *remove,* when it was used either by Francis or the witness. But it is plain from the whole of the testimony of this witness, that Francis did not consider Mis-sissippi as his place of residence, and it is distinctly stated that Brown recognized Indiana as his place of residence; that Francis came to Mississippi from Indiana in January, and remained until the following May or June, 1854. Whether he used the word *remove* or not, does not appear; for the witness was asked whether he stated that he was *leaving the State not to return any more;* and he answers, that he stated that "he was leaving the State for the purpose of removing, and that he never expected to see the county of Amite again." The true meaning of the witness doubt-less was, that Francis stated that he never expected to see the. county again; and, under all the circumstances, it is improbable, in the last degree, that Francis should have then considered that he was leaving his place of residence. For he had been then residing in Indiana since May, 1850, with the exception of two visits to Mis-sissippi, for short periods, was then acting for himself, as a free per-son, and was treated as such in the place of his residence.

Another circumstance relied on to show that their residence was in this State, is, that Brown paid taxes upon them in the year 1851. If that fact has any weight, it tends rather to show that they were not emancipated, than that their residence was not changed. But there is no room to doubt that Brown intended to emancipate them, and considered that he had accomplished his purpose. He cannot be

presumed, therefore, to have paid taxes on negroes whom he had freed. There is no proof that he paid taxes on them after 1851. But they were liable to taxes for the fiscal year of 1850, which was payable after the commencement of 1851 ; and it is, therefore, fair to presume that the taxes shown to have been paid, were those due for the year 1850, and which accrued previous to the removal from this State.

Upon consideration, therefore, of his purposes intended to be accomplished by him in relation to the children, his acts with regard to their condition and residence, and the general scope of his declarations upon the subject, it appears to be clear, that it was his intention to give immediate freedom to the children, and to locate them permanently in some State where they could be free, and that that intention was carried out by emancipating them and settling them in Indiana. And it is evident, from all the facts and circumstances shown in evidence, that the children were not taken from this State to be manumitted in another State, with the intent to be brought back to this State, or that they might exercise and enjoy their freedom here.

II. But if the evidence justified the conclusion that the slaves were taken away and emancipated with that intent, it would be necessary, in order to invalidate the manumission, to show that they were brought back to this State as free persons, in consequence of the manumission.

It is insisted, in argument, that the mere intent to emancipate and bring them back, though they were never brought back, or never returned to this State, is sufficient to render the emancipation void, as against the policy of our laws. But we cannot admit the correctness of this view.

When the slaves were taken to Ohio, and emancipated, and afterwards removed to Indiana, and declared to be free, and treated by their former owner as free persons, they were certainly entitled to claim to be free, and might have remained there as such, unless it was in contravention of the laws of those States. Their owner had voluntarily and designedly divested himself of the right of property in them, and placed them beyond the reach of our laws. And their right of freedom thereby became a *personal* privilege, which they were entitled to enjoy agreeably to the laws where it was granted,

notwithstanding any illegal intention with reference to the policy of this State, with which Brown may have taken them there. They had the right to remain there, and to claim and enjoy their freedom, as a personal right; and if they became, and continued to be, residents of Indiana, it would not have been competent for Brown to defeat their right, by alleging that he had taken them there to be emancipated, and with the intent of bringing them back, as free persons, contrary to our laws and policy. This illegal intent only becomes material to vitiate the emancipation, and can only render it void, when it is carried into action by bringing the slaves back to this State, in pursuance of the original design to evade our laws; and while they were residents of Indiana, and in the enjoyment of the freedom which Brown had thought fit to bestow upon them— which he had the right to do by virtue of his absolute property in them, and which was sanctioned by the laws of that State—neither their *status* as to slavery, nor their persons, were within the reach of our laws. They had been legally made free, and were beyond the jurisdiction of this State; and while they so continued, it was not competent for him to deny their legal right, and to assert that his act of manumission was void under our laws. The only exception to this is, where the act is designed and *carried out* as an evasion of our laws.

In order, therefore, to render such an act of emancipation void, it is necessary that it be made with the intent of bringing the slaves back to this State, and that that intent be carried out, by bringing them back, or by their return in immediate connection with the act of emancipation, so as to show that both acts are but parts of the same design. Both of these facts must subsist in order to constitute an exception to the rule, that a voluntary emancipation of slaves, made in a State where it is allowed by law, is valid, and confers freedom.

These principles are clearly recognized as the foundation of the rule declared in *Hinds* v. *Brazealle*, 2 How. 837, and are also sanctioned in *Ross* v. *Vertner*, 5 How. 305, and in *Leiper* v. *Hoffman*, 26 Miss. 615.

Brown unquestionably had the right to take the slaves to another State, where their emancipation was allowed, and to set them free there. That right is not restrained by our laws or policy, but is

distinctly recognized by the Statute of 1842, § 2, Hutch. Code, 537; and it necessarily resulted from his absolute right of disposition of them, as his property. The only restraint upon that right is, that he shall not emancipate them with the intent to bring them back to this State as free persons; which intent is carried out by their being brought back in connection with, and as a part of, the act of emancipation. If, however, they are not brought back, but become residents of the State where they are liberated, they are not within the policy of our laws, which are prohibitory, 1st, of freeing slaves in this State, to become free either here or in another State, and 2d, of emancipating them in another State to become residents of this State as free persons.

The case, therefore, is one of a valid act of emancipation, which might have been invalidated by bringing the slaves back to this State; but as that was not done, a necessary ingredient, to give an illegal character to the transaction, is wanting—the illegal design was never consummated, and the legal force of the emancipation is not impaired. It is merely a case of an illegal intent not executed, and which, therefore, cannot have the effect to render void a substantive act, in itself legal.

III. Again: it is said that these persons cannot claim the rights extended to free negroes by the laws of Indiana, because, though they were located there to reside, yet it does not appear that the provisions of the laws of that State, authorizing free negroes to reside there, were complied with by them, and hence that they are not shown to be entitled to the rights of free negroes of that State.

This objection to the validity of their emancipation is not made in the bill of complaint. The allegation of the bill is, that they were taken out of this State to be emancipated, with the intention of being brought back, which intention was carried out. The legality of their residence in Indiana is not called in question, and there is nothing in the bill to give notice that it would be required to be established. It was, therefore, not incumbent on the appellant to show, by positive proof, that the requirements of the laws of that State, in order to their residence there, had been complied with; for the issue presented by the bill was, whether they were brought back to this State to reside after their emancipation.

But it is shown, that they resided there from May, 1850, and acted as free persons, and were so regarded by the community in which they lived. Under such circumstances, and without a distinct issue made, of their non-compliance with the provisions of the local laws necessary to their residence there, it must be presumed that their residence was according to the laws of that State. *Leiper* v. *Hoffman,* 26 Miss. 615; *Shelton* v. *Tiffin et al.* 6 How. (U.S.) 163.

IV. The last question to be considered is, whether Francis and Jerome, as free negroes residing in another one of the United States, are capable of taking the bequest in their favor.

It is insisted, in behalf of the appellee, that inasmuch as they would be entitled, by the general rules of law, to pay off the debts of the testator, and then take the property directed to be sold for their benefit, the case must be regarded as though the property was left directly to them—that, as free negroes of another State, they are prohibited by our laws from coming into this State; in consequence of which, they are reduced to the position of alien enemies, or persons banished from the State, and are, therefore, incapable of holding property of any kind, or of having any rights here, or of suing in our courts; and that to allow them to become the owners of a plantation and slaves, would be dangerous to the slave population here, and in contravention of the spirit of our laws and public policy with regard to slaves. This argument assumes that Francis and Jerome legally acquired the *status* of freedom by their removal and emancipation.

We deem it necessary to consider only the question of the right of these parties, as it is presented by the record. If the question of the right of a free negro residing in another State to hold *specific property* in this State, not forbidden by the spirit of our laws, or dangerous to our institutions, is an open one, it is not now presented for determination by the case before us. We shall, therefore, confine our attention to the point really presented for decision; which is, whether these persons are entitled to have the property of the testator sold, as directed by the will to be done by the executor, and to receive from him the proceeds of the sale, after the payment of the testator's debts, in the manner directed by the will.

This right is controverted, on the ground that these parties occupy a position towards this State similar to that of *alien enemies,*

Shaw *v.* Brown.

*outlaws,* or *banished persons,* and are excluded from all protection of our laws, and from the enjoyment of all rights here, upon the same principle by which aliens anciently were not permitted to come into England, were debarred from suing there, and of all protection to their persons or their property, when in the country.

With respect to the condition of aliens in a foreign country, it is to be observed, that their rights have been greatly enlarged in modern times, from what they were in the days when the rigorous rules alluded to were in force, when they were regarded as enemies of the sovereign, and could only come into the country by license; and without such license, they were treated as public enemies, and any man had the right to kill them. These barbarian rules have passed away with the rude age in which they prevailed; and now an alien may reside in the country under the protection of its laws, and may contract debts; he may sue in its courts, and may even take an interest in land. *Craig* v. *Leslie,* 3 Wheat. 563; 2 Kent's Comm. 25 (8th edit.).

But negroes born in the United States, and free by the laws of the State in which they reside, are in a different condition from aliens. They are natives, and not aliens. Though not *citizens* of the State in which they reside, within the meaning of the Constitution of the United States, they are *inhabitants* and *subjects* of the State, owing allegiance to it, and entitled to protection by its laws and those of the United States; for by the common law, and the law of nations, all persons born within the dominion of the sovereign are his natural born subjects, and owe allegiance to him, and obedience to the laws, and are entitled to protection. It is true, that these persons are a subordinate and inferior class of beings, and "have no rights but such as those who hold the power and the government might choose to grant them:" *Dred Scott* v. *Sanford,* 19 How. 405; but they *derive their rights from the States in which they are domiciled.* These States may grant them certain rights of person and of property; and they would be entitled to the enjoyment of those rights in any other State of this Union, as inhabitants of one of the United States, and under its protection, unless their exercise should be positively prohibited by, or be incompatible with, the laws and policy of the State in which they might claim these rights. These rights are derived from the law of their

domicil, and should be respected in every other State, unless repugnant to their laws or policy, upon the same principle by which an alien is entitled to exercise rights in a foreign country, where there is a treaty of peace and friendship between his sovereign and that government. Assuredly, the right of an inhabitant of a State—in virtue of the Union between the States established by the Federal Constitution — to exercise, in any other State of the Union, the rights guaranteed to him by the Constitution and laws of his own State, cannot be inferior to the right of an alien in a country with which his sovereign is under treaty of alliance, of peace, and friendship. The Constitution of the United States cannot be less than a treaty of peace and friendship between the several parties to the compact.

As inhabitants of one of the States of the confederacy, free negroes acquire certain rights of person and of property there. If these States be regarded simply as occupying the relations of foreign States towards each other — with reference to the rights of their respective inhabitants, not embraced within the provisions of the Constitution of the United States — according to well-established doctrine, the rights of their inhabitants, secured by their own laws, would be respected in the other States where it might become necessary to assert them; and they would be enforced, unless they were incompatible with the laws and policy of the States where they might be sought to be enforced, or dangerous to their institutions. And in such a case, though the laws of the State would have no extra-territorial force, *proprio vigore*, yet their authority is admitted in other States or nations, upon reasons of comity; and this is a rule of such general acceptation among nations, that it has been considered a *private international law*. 2 Kent's Comm. 453–457; Story's Confl. Laws, § 29 *et seq.* Hence the rights of persons, as they are fixed by the law of their domicil, are observed and enforced in the tribunals of foreign civilized nations, unless they are prejudicial to the rights or powers of those governments, or in contravention of their public policy, or positive law: Ib.; and upon the same principle, the personal capacity of parties to contract, and their disability to enjoy, certain rights, as a general rule, depend upon the law of the place of the contract, or where the right accrued; and will be observed accordingly in

foreign tribunals, subject to the qualification above stated. 2 Kent's Comm. 458.

These rules of general law certainly lose none of their force when applied to a confederacy of States, united together as are the States of this Union, by a solemn compact for mutual protection, and to promote their common defence and general welfare; but must apply, with peculiar force, to the inhabitants of the several States, whose rights are guaranteed by their constitutions and laws. It is true, they are not the subject of specific provision in the Constitution of the United States, and are not embraced within the *terms* of that instrument. But they result necessarily from the nature of the compact. The States do not derive their rights from the Federal Constitution. They existed before the Constitution, and are superior to it, except when limited by it. But the Union formed by the Constitution is founded upon the implied covenant, that the rights of its constituent members, as sovereigns, shall be observed and respected. Such a stipulation was unnecessary to be expressed, because it was the very genius of the Confederacy. But the obligation to respect them, upon principles of international law relating to States in friendly alliance, necessarily results from the nature of the Union; and it is recognized in the declaration, that the rights not expressly granted to the Government formed, or limited to the States, are reserved to the States respectively. Otherwise, conflicts between the States, in relation to matters not enumerated in the Constitution, would be continual and irremediable, and the "perfect union," designed to be established by the Constitution, would be the most frail of human compacts. Accordingly, the doctrine is sanctioned by the Supreme Court of the United States, that these principles of international law apply with greater force between the people of the several States, than as between the subjects of foreign nations. *Bank of Augusta* v. *Earle*, 13 Peters, 519–590. In that case, the court disapproved of the doctrine, " that the States extend to each other no other rights than those which are given by the Constitution of the United States;" and held that a bank incorporated by one State might acquire rights in another State, and enforce them by suit. This was decided upon the principle of the comity of nations, which was held to be especially applicable to the States of this Confederacy, notwithstanding

it was not a matter of distinct provision in the Constitution.   In affirmance of this doctrine, as applicable to the States, the court say, "It is needless to enumerate here the instances in which, by the general practice of civilized countries, the laws of the one will, by the comity of nations, be recognized and executed in another, where the rights of individuals are concerned.   The cases of contracts made in a foreign country are familiar examples; and courts of justice have always expounded and executed them, according to the laws of the place where they were made, provided that law was not repugnant to the laws or policy of their own country.   The comity thus extended is no impeachment of sovereignty.   It is the voluntary act of the nation by which it is offered; and is inadmissible, when contrary to its policy, or prejudicial to its interests. But it contributes so largely to promote justice between individuals, and to produce a friendly intercourse between the sovereignties to which they belong, that courts of justice have continually acted upon it, as a part of the voluntary law of nations."

It is therefore impossible to hold that persons whose rights are protected by the States in which they reside, are to be considered in the *status* of aliens, outlaws, or banished persons, and therefore entitled to no rights whatever in this State, without doing violence as well to the established rules of the *jus gentium privatum* existing between foreign nations, as to the rights which result from the nature of the connection between the several States, as component parts of a national confederacy.   And it follows, that the rights of such persons must be respected here unless they are repugnant to our policy, or prejudicial to our interests.

Is it, then, against the policy of our laws that free negroes of other States of the Union should be capable of having any rights whatever in this State?   We think not.

It is true, they are prohibited from coming into this State.   But the reason of that policy has reference solely to their presence. Hence they are not allowed to be manumitted here, to take effect here or elsewhere, though they are permitted to be taken out of the State and there manumitted.   The mischief intended to be prevented, was their improper interference with our slaves, or the force of their example, in producing discontent and insubordination among them; and that could only arise from their presence here and intimate per-

sonal intercourse with the slaves.   It could not possibly come within that mischief, that they should take pecuniary legacies here or should acquire a right of property here which did not require their presence and could not bring them in connection with the slaves of the State ; for their presence is by no means necessary to the enjoyment of such rights.   And in the present case, the enjoyment of their right, as it is now presented, does not even require that they should have any intercourse with the executor in this State ; for he is required by the will to sell the property of the testator, and to deposit the money in bank in the State of Louisiana, for their use and benefit.   When the case is presented, which requires the personal presence of a free negro of another State here, in order to exercise any right claimed by him, it will be time enough to decide whether he is debarred of such right.   It is sufficient to say that this is not such a case, and should not be disparaged by illustrations not applicable to its circumstances.

It is true that our policy upon the subject of slavery would discountenance emancipation.   But no restraints are attempted by our laws to be put upon its exercise by our citizens in other States. Nor can the rights which legally accrue to the free negro in other States be considered as contraband of our laws, because such persons are not permitted to come to this State.   The *status* of freedom in the negro, may be considered as discountenanced here in principle, because not in consonance with our practice.   But that has no practical effect upon his *status* elsewhere ; and it could not be justly considered as an inhibition of his rights, legally acquired under the laws of his domicil, and which might be exercised here, without subjecting our slaves to the mischief, intended to be prevented by our laws, arising from the presence of free negroes here, and their influence upon our slaves.   This distinction may be aptly illustrated by reference to other matters of our policy as a State.

The laws and policy of this State are strongly in opposition to banks.   For years past, the legislature has discountenanced the banking system, by refusing to charter new banks, and by passing the most stringent and rigorous laws in relation to those already chartered.   The legislative disapprobation of the system is thus shown, and is well understood to be a matter of public policy. Suppose, in addition to this, as has been frequently proposed, that

the legislature should pass a statute prohibiting the circulation of the notes of banks of other States within this State.   That would show unmistakably that the circulation of such notes was illegal and against our policy, and would, in connection with our policy of refusing to charter banks in this State, go far to show a disapprobation of the banking system in other States.   But could it be contended for a moment, that such a policy would have the effect to debar a bank of another State, of the right to sue in the courts of this State—to take a legacy, if permitted by its charter—or to make any contract here, allowed by its charter, if such right was not prohibited by our laws, or repugnant to our declared policy ?   If, in such a case, it was objected, that the legislative acts showed that the *principle* upon which our policy was founded, was opposition to banks, and that that principle should be applied to the collateral rights of the foreign excluded bank, the answer would conclusively be,—the legislature has seen fit to declare its policy to a certain extent, to prohibit the circulation of bank paper within the State, and it is to be presumed that they extended the remedy as far as they thought the mischief intended to be prevented, required.

It appears to be evident, upon consideration of the subject, that free negroes are only debarred, by our laws, of the rights secured to them by the laws of other States where they are domiciled, so far as the exercise of those rights may be positively prohibited, or may be directly dangerous to the condition of our slaves, by exposing them to improper interference, or to the mischievous example arising from the presence or influence of the free negro ; and that beyond this, he may enjoy the rights secured to him by the laws of his place of domicil.

Any other rule than this, appears to be unwarranted by the provisions of our laws, and not in accordance with the principles either of natural justice, or of settled international law.   And this will be apparent by considering the rule contended for in behalf of the appellee, with reference to cases which may very naturally arise. That rule is, that the free negro is, by our laws, an outlaw, a banished person, or natural enemy of our people, against whom any man's hand may be raised with impunity, and as wholly without the protection of our laws.   Now suppose a free negro of Indiana to be the owner of horses or cattle, under the laws of that State, and

that they are illegally taken from him into the State of Kentucky, whose laws and policy are the same as those of this State, could it be maintained that he would not be entitled to sue for his property, in the courts of Kentucky? Surely not. Suppose he was taken forcibly from Indiana, and brought into this State, without color of right, and held in imprisonment or slavery, would he not be entitled to legal process here, to be restored to his liberty? Such right is beyond question. But suppose some individual, in order to subserve our supposed public policy, were to kill him as an outlaw and enemy of our people, could he be held justifiable in the act, because the person was a free negro of another State? If the argument in behalf of the appellee be sound, the act would be justifiable, if not praiseworthy.

These instances are but practical applications of the principles contended for, against the right of the legatees of the will, in this case, and serve to show that the rules contended for are totally unfounded in the principles of justice or of sound law.

Many collateral questions have been raised and urged in argument, by the counsel on both sides of this case; but we have considered the material questions arising upon the case, and which are decisive of its merits.

We are of opinion that the bequest was not void, under our laws, and that the decree enjoining the execution of it by the executor, is erroneous.

The decree is, therefore, reversed, and the bill dismissed.

SMITH, Chief Justice, did not sit in this case.